ATCHISON, TOPEKA & SANTA FE RAILWAY
COMPANY *v.* TOOPS, ADMINISTRATRIX.

No. 303.   Argued March 6, 7, 1930.—Decided April 14, 1930.

*Messrs. William Osmond* and *William R. Smith,* with
whom *Messrs. E. E. McInnis, Owen J. Wood, Alfred A.
Scott,* and *Alfred G. Armstrong* were on the brief, for
petitioner.

*Mr. Carr W. Taylor,* with whom *Mr. James N. Farley*
was on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Respondent, plaintiff below, brought suit in the Dis-
trict Court of Reno County, Kansas, to recover under the
Federal Employers' Liability Act for the death of her

intestate. Judgment in her favor was affirmed by the Supreme Court of Kansas, 128 Kan. 189. This Court granted certiorari, 280 U. S. 542, on a petition which urged as grounds for allowance of the writ that there was no evidence of negligence in the case or that any act of petitioner caused the death.

Decedent was a conductor in charge of petitioner's freight train, engaged in interstate commerce, while en route easterly from Elkhart to Dodge City, Kansas. He was killed near the station at Rolla, Kansas, at about one o'clock in the morning, in the course of a switching operation under his direction. At that point, north of the main line and connected with it by switches, is a " passing track " with an extension at its easterly end known as a " stock track." South of the station, which is south of the main line, is a switching track, referred to as an " elevator track," which forms a junction with the main line some three hundred feet or more east of the station platform.

On the night of the accident two switching operations were to be carried out by deceased at Rolla. The first, which was successfully completed, consisted of removing four loaded grain cars from the elevator track and coupling them, deceased assisting, to the train standing west of the station on the main line. The second involved the removal of fifteen empty grain cars, coupled to twelve stock cars, from the passing and stock tracks to the main line and thence " kicking " the grain cars onto the elevator track, that is, the train of grain and stock cars was to be pushed by the engine westerly along the main line and the fifteen grain cars uncoupled from the westerly end of the stock cars while still in motion and before the stock cars had reached the switch to the elevator track, thus propelling the grain cars from the main line to the elevator track. The stock cars were then to be kicked back onto the passing track by a similar movement, after

which the engine was to be coupled to the grain cars standing on the elevator track and they were to be spotted at desired locations on that track. Under the rules of petitioner, deceased was required to attend personally to these switching movements.

There were no eye witnesses to the accident. Deceased was last seen alive, standing, lantern and train book in hand, on the east end of the station platform. Plaintiff's own witnesses testified, without contradiction, that shortly before, one of the two brakemen of the train crew had read to the other and to deceased the switching list calling for the movement of the grain cars, and had then said that he would kick the cars onto the elevator track, to which deceased replied: "All right I will look out for them." After the grain cars had been kicked onto the elevator track and the stock cars onto the passing track, the engine was coupled to the grain cars and the spotting movement begun, when the body of the deceased was discovered. It was lying under the engine tender diagonally across the elevator track, with the shoulder against a " derail" about 180 feet west of the switch, connecting the elevator track with the main line, and about the same distance from the point on the platform where decedent had last been seen alive. His feet were toward the north, his head and arm had been severed from his body and lay just south of the track. His cap, lantern and lead pencil were lying near, together, south of the elevator track two or three feet from the south rail. His train book was found lying in the center of the track between the rails. The surface of the track between the rails showed that his body, after it had fallen to the ground, had been moved or dragged westward two or three feet until his shoulders were jammed against the derail. There were no marks of flesh or blood on any part of the first grain car, indicating that it had come into contact with the body of the deceased. There was uncontradicted testi-

mony that such marks of flesh and blood were found upon the south wheels of each of the succeeding fourteen grain cars and the engine tender.

It was controverted whether, within the meaning of printed rules of petitioner, the place of the accident was at a " station " or in a " yard." The rules required that when cars were pushed by an engine " except when shifting or making up trains in yards," a flagman should be placed on the front of the leading car so as to signal the engineer in case of need, and that a white light must be placed on the leading car at night. No flagman or brakeman, and no light was placed on the leading grain car. Owing to the location of a curve and cut through which the grain cars passed in order to reach the elevator track, it was impossible for the engineer or the two brakemen to see deceased or his lantern at the point where his body was found. There was evidence that no warning signal by bell or whistle was given in the course of the kicking movement.

It is the theory of the respondent, conforming to the findings of the jury in its special verdict, that deceased, while crossing the track near the derail, where, according to some of the testimony the roadbed was overgrown with weeds and so thinly ballasted that the track had become " skeletonized," was knocked down by the leading grain car and killed by that and the succeeding cars passing over him, and that his death was attributable to negligence in carrying out the kicking movement of the grain cars without signal and without placing a flagman or a light on them.

But proof of negligence alone does not entitle the plaintiff to recover under the Federal Employers' Liability Act. The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause and the case must be withdrawn from its consideration unless there is evidence from which

the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer. *Patton* v. *Texas & Pac. Ry. Co.*, 179 U. S. 658; *New Orleans & N. E. R. R. Co.* v. *Harris*, 247 U. S. 367, 371; *St. Louis & San Francisco Ry. Co.* v. *Mills*, 271 U. S. 344, 347; *C. M. & St. P. Ry.* v. *Coogan*, 271 U. S. 472; *New York Central Railroad Co.* v. *Ambrose*, 280 U. S. 486.

Even though we assume that in all the respects alleged the petitioner was negligent, the record does not disclose any facts tending to show that the negligence was the cause of the injury and death. The only evidence relied upon by respondent to account for the deceased's presence at the point of the accident was that already stated, which indicated that he had proceeded to the elevator track in order, as he said, to "look out" for the kicked cars, whether by climbing onto them and controlling their movement on the elevator track, as is usual in such movements, or by assisting in the spotting movement to be later carried out, can only be inferred. It is the theory of respondent that he attempted to cross the track so as to be in a position to signal the engineer who was on that side of the train. But as the grain cars already were, or were about to be, uncoupled from the train, there was evidently no immediate purpose in his being so located. What actually took place can only be surmised. Whether he was run down on the track by the first car or he attempted unsuccessfully to board the train on one side or the other or succeeded and in either case finally came to his death by falling under or between the moving cars is a matter of guesswork.

Even though we make the doubtful assumption that the train was not within a "yard" and so was required to signal its movements, it is plain that deceased and his train crew treated the place as a yard where warning of switching movements was not required. On respondent's own theory deceased was fully cognizant of the

contemplated movement. He knew that the grain cars were to be kicked onto the elevator track where he went to meet them, and knew that his train crew, consisting of only two brakemen, and the lanterns which they carried, would be needed in attending to the switching, signalling and uncoupling of cars in order to kick the train of stock cars onto the passing track and that the grain cars for which he was to "look out" would be without brakeman or warning light. It is presumed that deceased proceeded with diligence and due care. *Looney* v. *Metropolitan R. R. Co.,* 200 U. S. 480, 488. The movement of the fifteen cars to and across the switch and onto the elevator track in a quiet neighborhood on a still night can not be assumed to have given no warning sounds of their approach.

All these factors taken together render highly improbable the theory of respondent that deceased was run down by the grain cars while he was crossing or standing upon the track, and they give sharp emphasis to the absence of any proof of the fact, indispensable to respondent's case, that deceased, while standing on or attempting to cross the track, was struck by the leading car. There is no evidence to suggest that the body, after falling to the ground, was moved or dragged more than two or three feet. There were no marks of blood or flesh of the decedent upon any part of the leading car, although such marks were found on most if not all of the cars following. The kicked grain cars were moving slowly when they passed the switch to the elevator track as they came to a stop two or three car lengths west of the derail. It is true that there was medical testimony that in the case of crushing injuries bleeding might not immediately ensue, but the length of this period of delay was not mentioned and the testimony given was not stated by any witness to be applicable to injuries of the extent and character suffered by the deceased. It does not account

for the absence from the leading car of the other evidences of the injury found on the other cars. As evidence to support the special finding of the jury that the deceased was struck by the first car, this testimony is without substance. See *Gulf, Mobile & Northern R. R.* v. *Wells,* 275 U. S. 455. If allowed to sustain the verdict it would remove trial by jury from the realm of probability, based on evidence, to that of surmise, and conjecture.

*Reversed.*