## SWANER v. UTAH IDAHO CENT. R. CO.*
### No. 341.

Circuit Court of Appeals, Tenth Circuit.
Dec. 23, 1931.

McDERMOTT, Circuit Judge, dissenting.

*Rehearing denied February 23, 1932.

Willard Hanson, of Salt Lake City, Utah (A. H. Hougaard, of Salt Lake City, Utah, on the brief), for appellant.

James A. Howell, of Ogden, Utah (James H. DeVine, David L. Stine, and Alfred W. Agee, all of Ogden, Utah, on the brief), for appellee.

Before LEWIS and McDERMOTT, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge.

Trespass on the case. Plaintiff alleged in his complaint: that on September 8, 1927, he was employed by defendant as a motorman on its electric railway, operating the motor car of a freight train from Ogden, Utah, destined to points in the State of Idaho, and was so engaged in interstate commerce; that the sanders on his motor were out of repair and the sand would not fall on the rails; that plaintiff was directed by the trainmaster, who was then acting as train-conductor, to straighten the sandpipes; that plaintiff went to the front of the motor while it was moving slowly, and while standing in the stirrup on the side of the motor car he attempted to kick the sandpipe into its proper place; at the time plaintiff was kicking the sandpipe under the direction of said conductor, who knew plaintiff's position and what he was attempting to do, the conductor carelessly and without warning caused the train to move suddenly forward and as a result of the sudden forward movement a wheel of the motor car passed over plaintiff's right foot. He was taken to the hospital and the foot was amputated.

Defendant answered that it was using due care, and the accident was caused by plaintiff's negligence; that plaintiff knew and appreciated the danger and assumed the risk of incurring the injuries; that plaintiff was warned and directed not to kick the sandpipe; that plaintiff acted contrary to defendant's rules and instructions to employees.

A jury was called and empanelled, and after each party had introduced evidence and closed, the court over the objection and exception of plaintiff sustained defendant's motion for a directed verdict in its favor. That action presents the issue here.

Plaintiff testified to his employment, as he had alleged in his complaint; that D. S. Clark was acting as conductor on the train and in charge thereof, his duties in part consisting in directing the men what to do in the movement of the train; that they left Ogden on the morning of September 8th, and when they got to Peery Hill he noticed the train

was slipping; that he increased the speed; he asked the brakeman to look at the sandpipes, the brakeman reported that the pipes were to the left of the wheels instead of being in front of them, and the sand was going off the rail instead of on it; that the appliances were so arranged that he could have the sand run down on the rail when necessary, this was to keep the wheels from slipping; he told the brakeman it would have to be fixed, and the conductor told plaintiff not to let the brakeman do it but to go and fix it himself; it was his duty to obey the conductor's orders; he went down to kick the sandpipe to get it in line with the wheel, and in order to do that he put his left foot in the stirrup at the left front corner of the electric motor car; the stirrup consisted of two strips of iron and is used by employees to climb onto the platform of the motor car, two grab irons are bolted to the frame of the motor car for handholds, and the stirrup and handholds on the side near the forward end are used by employees for climbing on and off the motor car; he stood on the step holding onto the grab iron and was using his right foot to kick the sandpipe into place, the sand was going onto the ground; there was a sandpipe for the other rail, but if one side was off the other side is off in a corresponding manner, and by kicking the pipe on one side both would be put in place; he kicked the pipe two or three times, and it was going back into place; there was a sudden jerk in the motor, it caused him to lose his balance, and it threw his foot under the wheel, and the wheel ran over it; he had operated a motor for twenty-two months and was familiar with it; the control is a little bar that projects from the box and is operated as a street car is operated; you can advance it to give more power and pull it back for shutting off the power; these motors are in what they call series, there are nine points; you advance the control, and the electricity goes into the resistance grid and from the grid into the motor as it goes through the series; the first five points are in series, and he left it in series when he went down to kick the sandpipe; the speed at that time was three or four miles per hour; if it is left in that position the motor will continue steady and will not jerk; giving it more power will make it jerk as it did when he was hurt, that is, it went forward suddenly, and it had been going steady before, it increased its speed suddenly and threw his foot under the wheel; that sudden movement would be caused by the application of more power; when he asked the brakeman to go out and look at

the pipes the control was on series at point five, point six is one point past series. He further testified that Clark, the conductor, took his seat at the control when he went to kick the pipes, that Clark sat on the stool in his position; that Clark walked up and put his hand on the control and had his hand on it when plaintiff went out; that he could not see Clark's hand when he kicked the pipe and when the motor moved suddenly forward, he could see his face, and he was still at the control in the same position as he was when plaintiff went out, and that Clark could see plaintiff's position when he was kicking the pipe and knew what plaintiff was doing; he did not have a hammer with him when he was kicking the pipe, he couldn't have reached it with a hammer; it was customary to do it with the foot, and it is the custom of all the employees; after plaintiff was hurt the conductor operated the motor.

Mr. Burchell, the brakeman, testified that plaintiff told him to go out and look at the sandpipes which he did, and the sand was running on the outside of the rail; that he told the plaintiff what he saw, and the plaintiff said he would have to fix it, and Mr. Clark, the conductor, said to Mr. Swaner, "Don't let him (the brakeman) fix it, you go fix it," and said, "I will take the control." That at that time Clark, Swaner, and the brakeman were the only ones in the motor. The brakeman further testified that when plaintiff went out Mr. Clark sat down on the motorman's seat and put his hand on the control, and that he, Burchell, followed Swaner out; that while plaintiff was kicking the sandpipe there was a sudden movement forward of the train; that Swaner cried out immediately following the sudden movement, and he assisted Swaner onto the platform; that Mr. Clark was still on the motorman's seat at the control; that Clark then stopped the motor, and they took plaintiff to Ogden, Mr. Clark operating the motor all the way in.

Mr. Clark as a witness for defendant testified that the train consisted of six loads and one empty; that when they got almost to Woods Siding there was a bunch of horses on the track, and they slowed down; that they started up the hill again, and Mr. Swaner said to the brakeman, "Go out and see if the sanders are working;" that the whole crew including the trolleyman was then inside the cab; that the brakeman went out, looked at the sanders, came back and told the plaintiff that the sand was running but was not hitting the rails; Mr. Swaner said, "Watch her, D. S. (addressing Clark), and I will go down and kick that sandpipe over; maybe it is

out of line," and that he warned him not to do that; he said: "To hell with that sand-pipe, we will make it, all right. You will get your foot caught." He thought Swaner said: "I will watch that, all right." Anyway, Swaner went out, climbed down the left side of the motor to the front end, and that was the last Clark saw of him until he saw Bur-chell, the brakeman, help him up on the end of the motor; Clark then thought something was wrong and stopped the train. When Swaner was going out Clark stepped up to the controller, but he testified he did not take hold of it, he did not sit down, he did not touch the controller at all until he shut off the power to stop the train; from the time Mr. Swaner left the cab until Clark shut the power off there was no sudden jerking or for-ward movement of the locomotive; after the plaintiff climbed down onto the step Clark could not see him; the wheels were not slip-ping at all, and there was no occasion for the sand to be used; Clark could not see any-thing to occasion Mr. Swaner to inquire about the sander, so far as the movement of the train was concerned. Clark said he observed the position of the control switch handle at the time Mr. Swaner left the cab, and it was in parallel position, that is, it was on point nine; that is the full maximum distance that the control can be thrown, and could not be moved forward to feed any more power into the motor; at that point there is a jamb that the controller handle goes up against, and it cannot be pushed any further; that he ob-served that the control was at point nine when he stopped the train, and he hadn't touched it up until that time; that it was al-so at point nine when Swaner left it; that it was natural for him to make this observa-tion and see the position the controller was in.

The trolleyman, who claims he was in the cab, testified there was no jerk or sudden movement of the train, that he was not in a position to know whether the conductor touched the control with his hand, and that he heard the conductor warn Swaner not to go out and attempt to kick the sandpipe.

The defendant's electrical and mechanical engineer and a shopman testified that imme-diately after Swaner was brought to Ogden they examined the sandpipes on this motor, that the pipes were in position and rigid and could not be moved even with a hammer.

There was evidence that one other train was in the same power circuit as was the train on which plaintiff was motorman at the time of the injury, and it was then just leaving Brigham; that if a circuit breaker should kick out at one station on account of heavy pull the power would be diminished and the speed slackened, and on replacement of the breaker there might be a sudden movement of the trains. But there was no proof that this occurred at the time Swaner was injured, or that the train leaving Brigham was a heavy load on the current.

Let us return to the scene of the acci-dent. All seem to agree that a sudden move-ment of the control from point five on series, where plaintiff testified he left it, to point nine, where Clark testified it stood immedi-ately after the accident, would have caused a jerk or sudden forward movement of the train; and the evidence shows that Clark was the only person in position to move the con-trol from point five to point nine, and Clark knew plaintiff's position and what he was doing at the time he was injured. There was testimony that Clark took the motorman's seat at the control and put his hand on the lever. We are of the opinion on the evidence there was an issue of fact for the jury as to whether Clark was guilty of the claimed neg-ligence in moving the control from point five to point nine. If a jury should accept Swan-er's evidence as to the position of the con-trol when he went out, a finding that Clark moved it to point nine would seem to neces-sarily follow. If Clark's evidence on the point should be accepted as true, a contrary conclusion would follow. If it be true, as claimed by defendant, that the evidence in-dicated that the claimed jerk might be at-tributed to a cause other than that alleged in the complaint, we see no reason why that point cannot be guarded by proper instruc-tions to the jury, on the principle that a jury cannot indulge in guessing the cause of the jerk, but must find that Clark's negligent act was the proximate cause, before it could re-turn a verdict for plaintiff. But the evi-dence for defendant in that respect raised a mere possibility and not probability.

And so we order a reversal and a new trial.

McDERMOTT, Circuit Judge (dissent-ing).

I am unable to agree with my associates for three reasons:

(a) Where a jury must speculate as to the cause of an accident—where several things may have caused it—I do not think the point can be "guarded by proper instructions to the jury." I think such a case should not be submitted to the jury.

(b) It is true that the defendant did not prove that the jerk in fact resulted from one of the other probable causes. But neither did plaintiff prove that the jerk in fact was occasioned by the acts of Mr. Clark, the trainmaster. Where the uncontradicted evidence discloses several things that might have caused an accident, and the plaintiff fails to prove that one thing did cause it, the plaintiff has not proved his case; it is not necessary that the defendant affirmatively prove that the accident was caused by a thing for which it was not responsible.

(c) If the evidence disclosed a probability that defendant's negligence caused the injury, and that the other suggested causes were mere possibilities, the question would be presented as to whether the circumstances were sufficient to enable a jury to find as a fact that defendant was negligent. I shall not go into that, for I disagree with the statement that the evidence as to other causes "raised a mere possibility and not probability." I believe the other causes are much more probable than the plaintiff's theory that Mr. Clark advanced the control when the plaintiff was swinging under the train.

The majority opinion states the facts fairly and fully. I disagree with one conclusion. The plaintiff testified he left the control at point five. Mr. Clark testified that he "observed the position of the control switch handle at the time Mr. Swaner left the cab" and that it was on point nine, which was its limit. He testified positively that he did not advance the control—in fact he says he did not touch it until after the accident. Others say he did touch it, but no one testified he advanced it. There is a straight conflict between the two as to whether the control was left at point five or nine. The jury, of course, can believe it was left at point five; by so doing, they find it was not left at point nine. It was one or the other. The only scrap of evidence that it ever was at point nine was Mr. Clark's, who testified it was there when plaintiff left it. I do not agree that from this conflict the jury can find it was at point five when he left it, that it was at point nine at a later time, and that therefore Mr. Clark moved it. When the jury finds it was at point five, it rejects Clark's evidence that it was then at point nine; the jury cannot then pick up this rejected evidence, move it forward in point of time, and find it true, and upon this rest a finding that Clark moved it. A jury may believe a portion of the testimony of a witness and not believe all of it; but they cannot reject as untrue the statement of a witness on one particular point for one purpose, and accept the same statement as true for another purpose.

My view of the case may be summarized as follows: There was a jerk that injured plaintiff. The jerk could have been caused by advancing the control. The trainmaster was in position to advance it. If he did advance it, the defendant is liable. He denies it, but the jury need not believe him. There is no direct proof that he did advance it; there is direct proof that he might have. If the evidence disclosed no other reasonable explanation for the jerk, the circumstances would be strong enough to carry the case to the jury. I agree that a "mere possibility" of another cause being responsible is not enough to throw the case into the realm of conjecture. But I think the undisputed evidence discloses other causes that with equal or even greater probability might have caused the accident; if that is true, it is no longer a simple question of whether the circumstances warrant a finding of guilt; the question then becomes, may a jury select one of these probable causes and rest a verdict thereon? I do not think so. Let us now see whether the record discloses more than one probable cause for the jerk.

Common knowledge teaches us that a jerk may be occasioned either because of increased traction, or by a sudden acceleration of power. If the wheels are slipping, and sand is applied to the rails, a jerk may result when the sand takes hold. The plaintiff needed sand because the wheels were slipping; he swung under the train to adjust the sand spout; he kicked it "and it was going back into place, and there was a sudden jerk." The most reasonable explanation of the accident is that his last kick did the work, for the spout was in alignment when it got back to the roundhouse; this of course would result in the wheels taking hold and would cause the jerk. But I must lay that to one side, because plaintiff testified that he did not get the sand spout over far enough before his foot caught, and because he said the wheels were no longer slipping when he got down on the stirrup.

Eliminating traction, the jerk must have come from a sudden acceleration of power. The evidence is undisputed that it may have come from several sources. The evidence is likewise undisputed that such jerks were a common occurrence, one of plaintiff's witnesses testifying that such jerks as the one which injured plaintiff occurred "practically every trip." Two of the reasons for such jerks disclosed by the record—crossed wires or birds—I do not stop on, for such occur-

rences were rare, and I think should be excluded from consideration as being but possibilities. But there is evidence which is undisputed and rational, that discloses at least two probable reasons for such acceleration of power.

(1) The jerk could be caused "by a surge reflected back from the Utah Power and Light Company's system. We get that quite often."

(2) The plaintiff himself testified that,

"In my experience where heavy loads were attempted to be moved over the hills either at Collinston or the Peery hill, the circuit breakers would be kicked out so if a train were operating on the line up the Collinston hill at the same time we were climbing the Peery hill that morning, the amount of electric current that would be coming into our motors would not be lessened because of a train pulling up the Collinston hill, but if the operation of the train that morning kicked a circuit breaker out for an instant either at Ogden or Dewey, that substation would be off the line for an instant, and the amount of current coming into the line would be lessened by the proportion that that substation furnished to the line, and if the operator at the substation threw the switch back in, there would be a surge of current in the line that would cause the motors on it to kick out or spin their wheels, and that would be true whether we touched the control or not. It might have the effect of jerking the train."

The engineer for the defendant likewise testified that if two heavy trains operated at the same time on a line fed by the Dewey and Ogden substations, so as to make a greater demand for current than the line was designed to furnish, the circuit breakers kick out; the station operator immediately replaces them, and when that occurs, the effect on the locomotive is the same as suddenly advancing the control. On this line, at the time of the injury, were two trains,—No. 951, the one on which plaintiff was injured, which was struggling to get up a hill without doubling; and another, No. 901, which was leaving Brigham City at 7:45, which was the hour of plaintiff's injury. This train consisted of eleven cars and an electric locomotive of about twice the capacity of No. 951. Although the record is not clear, it looks as if a third train, No. 904, must have been on the same line. But assuming there was but one other train, we still have undisputed proof that the stage was set for that condition to arise which plaintiff himself testified "might have the effect of jerking the train"; we

have No. 951 struggling up Peery Hill; we have No. 901—a heavy train—starting out of Brigham; and it takes plenty of power, in starting trains, to overcome inertia.

With all deference, it seems to me this evidence discloses more than a possibility of a cause for the jerk; indeed, it seems to me that either one of these causes is more probable and rational than the theory advanced by plaintiff—that Mr. Clark did the unnecessary and inhuman thing of advancing the control without warning while plaintiff was swinging a leg under the train and in front of the wheels.

I suppose there is no principle more thoroughly imbedded in our jurisprudence than that a plaintiff may not recover if his evidence leaves the cause of his injury in the realm of speculation and conjecture, and that it is not for the jury to guess between causes, any one of which might reasonably have caused the injury. A few of the cases in the Supreme Court of the United States, applying this principle to negligence cases, are Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Looney v. Metropolitan Railroad Co., 200 U. S. 480, 26 S. Ct. 303, 50 L. Ed. 564; St. Louis, I. M. & S. Ry. v. McWhirter, 229 U. S. 265, 33 S. Ct. 858, 57 L. Ed. 1179; St. Louis, etc., Ry. v. Mills, 271 U. S. 344, 46 S. Ct. 520, 70 L. Ed. 979; Chicago, M. & St. P. Ry. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041; New York C. R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; and Atchison, T. & S. F. Ry. Co. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896. The rule has been stated so many times that on November 2, 1931, the Supreme Court reversed the Supreme Court of South Carolina without opinion, other than the citation of the applicable cases. Southern Ry. Co. v. Moore, 52 S. Ct. 38, 76 L. Ed. ——.

I do not understand that my associates disagree with this principle of law; in fact, our own court has twice announced the principle and cited many of these cases. Leslie v. United States (C. C. A.) 43 F.(2d) 288; Order of United Commercial Travelers v. Greer (C. C. A.) 43 F.(2d) 499. They believe the facts in the case at bar do not bring it within that principle. An examination of the facts in the Supreme Court cases cited convinces me that this case is well within the principle, but I shall not lengthen this opinion by an analysis of such facts. Some of them, in my opinion, are stronger cases for the plaintiff than this one. In one of them,

the facts are closely kin. In the Patton Case, 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361, the negligence charged was that the engine step was insecurely fastened, and as a result, the plaintiff slipped under the engine and lost his leg. The court found that it was impossible to tell how the step became loosened; that it might have been from the ordinary working of the engine; or because it struck something on the trip; or because lumps of coal were dropped on it; that these things, although not proven to have occurred, were as reasonable as plaintiff's theory, which was that a foreman who took the step off had failed to securely fasten it, as he testified he did.

There, as here, several things might have caused the injury. There, as here, there was no proof that any of the several things did in fact occur. There, as here, there was no proof as to what did cause the injury. In that case, the Supreme Court held that the trial court should have directed a verdict for the defendant. Judge Johnson's ruling seems to me to be in accord with this and the other cited cases. For these reasons, I think the case should be affirmed.