MUSGROVE v. MANISTIQUE & LAKE SUPERIOR RAILWAY.

1. MASTER AND SERVANT—NEGLIGENCE—EMPLOYERS' LIABILITY ACT —RAILROADS—CUSTOMS AND USAGES—QUESTION FOR JURY.

In action against railroad company under Federal employers' liability act (45 USCA, § 51 *et seq.*) for alleged negligent killing of plaintiff's decedent while he was engaged in making coupling in nighttime, evidence *held*, sufficient to take to jury question of whether there was established custom requiring defendant to have man on forward end of moving cars, in switching operations in nighttime, for purpose of signaling engine crew and making operation more safe for one making coupling.

On excessiveness or inadequacy of damages for personal injuries resulting in death of switchman, see annotation in 48 A. L. R. 860.

2. SAME.

Whether plaintiff's decedent was, at time of receiving his injuries, in proper place and performing part of his duties in connection with switching operation, *held*, question of fact for jury.

3. SAME—CONTRIBUTORY NEGLIGENCE—COMPARATIVE NEGLIGENCE.

Widow's cause of action brought under Federal employers' liability act for negligent death of her husband would not be defeated by decedent's contributory negligence, if defendant was negligent as charged in declaration.

4. SAME—PROXIMATE CAUSE.

Evidence *held*, sufficient to establish causal relation between defendant's alleged negligence and injuries sustained by plaintiff's decedent.

5. SAME—TRIAL—INSTRUCTIONS—ASSUMPTION OF RISK—CONTRIBUTORY NEGLIGENCE—PROXIMATE CAUSE.

Charge of court *held*, to present fair statement of law applicable to controverted issues of fact, and to cover with sufficient fullness questions of assumed risk, contributory negligence, and proximate cause.

6. SAME—FAILURE TO DEFINE PROXIMATE CAUSE.

Failure of trial court to define proximate cause was not reversible error, where there was no proper request therefor, and court's attention to said failure was not called until after jury had been placed in charge of officer ready to retire to jury room.

7. SAME—DAMAGES.

Testimony by widow of decedent that he supported his family and that he gave his pay checks to her, together with stipulation that he was earning $2,000 per year, *held*, sufficient, in absence of evidence to contrary, to enable jury to pass upon question of pecuniary loss suffered by his family.

8. SAME—MINIMIZING DAMAGES.

Portion of charge of court relative to minimizing damages under Federal employers' liability act in event decedent was guilty of contributory negligence, *held*, not erroneous.

9. SAME—DAMAGES—EXCESSIVE VERDICT—PAIN AND SUFFERING.

Verdict of $16,000 for death of plaintiff's decedent, who was 48 years of age with life expectancy of 22.36 years, *held*, not excessive, in view of testimony as to his contributions to his family, and as to his pain and suffering.

Appeal from Schoolcraft; Runnels (Herbert W.), J. Submitted April 14, 1932. (Docket No. 117, Calendar No. 36,395.) Decided September 16, 1932. Certiorari denied by United States Supreme Court January 9, 1933. 287 U. S. 669 (53 Sup. Ct. 313).

Case by Elizabeth Musgrove, administratrix of the estate of Thomas L. Musgrove, deceased, against Manistique & Lake Superior Railway under the Federal employers' liability act (45 USCA, § 51 *et seq.*). Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Herbert J. Rushton* and *N. C. Spencer,* for plaintiff.

*Smith, Beckwith, Ohlinger & Froelich* and *James C. Wood,* for defendant.

NORTH, J. This is an action by plaintiff to recover damages on the ground that her decedent's death was caused by negligence chargeable to defendant. Decedent, Thomas L. Musgrove, was a brakeman working in connection with other members of a switching crew employed by defendant company in its railroad yards in the city of Manistique. The crew consisted of a conductor, two brakemen, the engineer, and fireman. While they were working on the night of April 3, 1930, the engine, moving forward and in a southerly direction, was coupled onto three tank cars standing on a siding which extended from the main switch track. Thereafter the train was backed in a northerly direction onto the main switch track; it then again proceeded in a southerly direction over a switch and upon another siding extending in a southwesterly direction. On this siding there were two groups of flat cars, four cars in each group. From the point where the first coupling was made plaintiff's

decedent proceeded in a westerly direction across to where the flat cars were standing for the purpose of making the couplings to these cars. When the train moved northward the other brakeman went with it to throw the switch, and the conductor also went with the train to guard the highway which crossed the tracks in this locality. After the switch was thrown the engineer on signal proceeded in a southerly direction and passed over the crossing for the purpose of picking up the flat cars. It is fair to infer from the testimony that plaintiff's decedent had adjusted the coupler on the northerly end of these flat cars and had thereupon gone to the southerly end of the first group of four cars. It is plaintiff's contention that the testimony fairly indicates he did this incident to preparing the couplers between the two groups of flat cars so that they could be coupled together. The coupling between the leading tank car and the most northerly one of the flat cars was completed; and thereupon the conductor walked down the tracks toward the point where the coupling was made, and, hearing a call, asked of plaintiff's decedent: ''Do you want me to back up or go ahead?'' Decedent called back: ''I am hurt.'' He was found on the westerly side of the track about eight feet from the south end of the fourth flat car, his foot caught under the second wheel of the south truck. He had received severe injuries, and died the following morning. The members of the switching crew agree that it was known to all of them that the switching operation they were performing included as one transaction picking up the three tank cars, backing out on the main switch track, going forward onto the second siding, and making a coupling with the first four flat cars, then proceeding to couple onto the second group of flat cars.

Plaintiff's declaration alleges that it was the duty of the defendant and of the co-employees of the deceased to use reasonable care in switching and coupling cars so that deceased would not be exposed to unusual or undue danger in the performance of his duties; and that it was also the duty of defendant and decedent's co-employees not to back the locomotive and its attached cars up to and against the flat cars to which coupling was to be made without being signaled to do so, and to know the location of such cars and to have a man stationed on the rear end of the train which was backing up who would be able and whose duty it would be to signal the engine crew and to assist in making the coupling; and, further, it was the duty of the other members of the train crew to so handle the train that the coupling could and would be made gently and without violence. Alleged neglect of these duties is asserted by plaintiff as the cause of the injuries to, and death of, her decedent.

On the other hand, defendant asserts that decedent's duty was to be at the northerly end of the first group of four flat cars, where the coupling was to be made, and that he sustained his injuries because of his failure to remain at the point where this coupling was to be made instead of placing himself in another and dangerous location. Also defendant contends that there is no evidence in this record that the alleged custom of placing another employee on the forward end of the moving cars was certain, uniform, and invariable, or that it was universally observed and known to the defendant railroad company, or that the company had promulgated such a rule; but, on the contrary, that it is shown in this record that this was not the custom where, as in this case, there was a brakeman in the field to signal the engineer when to proceed and

when to stop; and it is further defendant's contention that all the testimony which bears upon this phase of the case is to the effect that this entire switching operation was conducted in the usual and proper manner.

Plaintiff recovered a verdict on trial by jury and had judgment for $16,000. Defendant has appealed, and as reasons in support thereof asserts: (1) The trial court should have granted defendant's motion for a directed verdict and also its subsequent motion for judgment *non obstante;* (2) there was no evidence of negligence chargeable to defendant or of a causal relation between defendant's negligence, if any, and decedent's injuries; (3) that proper instructions were not given to the jury as to assumption of risk, contributory negligence, and proximate cause; and (4) there being no evidence of damage except that incident to the pain and suffering of plaintiff's decedent, the damages are excessive.

A careful review of the record in this case satisfies us that there was testimony which fully justified the trial court in submitting to the jury the question of whether there was an established and definite custom on the part of the defendant requiring the placing of a man on the forward end of moving cars in switching operations in the nighttime for the purpose of assisting in making the operation more safe by way of signaling the engine crew and protecting the one making the coupling. So far as the record discloses the defendant company had no rules governing this phase of its operations; and each of the four members of this switching crew, who for years had been working together, gave testimony tending to support plaintiff's claim in this particular. We are also satisfied that it was a question of fact for the jury whether plaintiff's decedent

at the time of receiving his injuries was in the proper place and performing a part of his duties in connection with this switching operation. The coupler on the northerly end of the first four flat cars had been placed in position so that the coupling was automatically completed; and the record is wholly consistent with plaintiff's claim that her decedent had gone to the other end of these four cars for the purpose of adjusting the coupler between the two groups of flat cars so that this final coupling of the proposed operation might also be made. It is plaintiff's theory that her decedent was in the act of adjusting the coupler at the south end of the first four flat cars at the time the engine and three tank cars struck them with undue force and without decedent being in any way warned thereof. In this connection plaintiff charges defendant with negligence because of the failure on the part of decedent's co-employees to give the engine crew such signals as were proper and necessary to slow down the approaching locomotive and complete the coupling with only a reasonable degree of impact. Defendant was engaged in interstate commerce, and hence, even if, under plaintiff's theory, her decedent was guilty of contributory negligence, that would not defeat her cause of action brought under the Federal employer's liability act (45 USCA, § 51 *et seq.*). The trial judge was right in holding that the issue of defendant's negligence in the manner alleged in plaintiff's declaration was a question of fact for the jury.

In defendant's motion for a directed verdict and also for judgment *non obstante,* it is urged that, even if defendant's negligence is established, it is not shown to have been the proximate cause of decedent's injuries. This contention is not tenable.

The record shows that the other members of the switching crew knew Musgrove was to attend to the necessary couplings incident to picking up the flat cars. It is obvious that, to make a safe and proper coupling in the nighttime, the engineer should have the assistance of other members of the switching crew in governing the movements of his train as it approaches the standing cars to which coupling is to be made. Here the engine pushing the three tank cars was proceeding slowly, about three miles per hour; but the engineer's view ahead was wholly obstructed by the cars in front of his locomotive and by reason of a curve in the tracks, and the speed of the train was not slackened before the impact with the flat cars, which were moved ahead from four to six feet and possibly more. The engineer testified:

"*Q.* Now, it is the custom among railroad men in backing up, especially in the night, especially backing up or going ahead, with a dead end, to have a brakeman with a light on that dead end, isn't it?

"*A.* Yes, I think it is rulable.

"*Q.* And he is there for the purpose of signaling to the fireman, or to you, for the movements of the train?

"*A.* Yes, sir.   *   *   *

"*Q.* If there had been anybody on the dead end he (the fireman) would have seen them and taken his signal from them, wouldn't he?

"*A.* Yes, I think he would.   *   *   *

"*Q.* And when you had gone about two car lengths from the crossing you struck something and then stopped, did you?

"*A.* Yes, sir.

"*Q.* Afterwards you discovered it was some flat cars that you had run into?

"*A.* Yes, sir.

"*Q.* You didn't know you were going to hit the flat cars?

"*A.* No, I did not.

"*Q.* Didn't know you were as near to them as that?

"*A.* No, I didn't.

"*Q.* You couldn't see ahead?

"*A.* No, I couldn't.   *   *   *

"*Q.* As I understand, you didn't know the exact location of them (the flat cars)?

"*A.* No, I did not.   *   *   *

"*Q.* When you say that you did not expect to hit the flat cars, what do you mean by that?

"*A.* Why, I didn't expect to hit them so soon. They were generally farther down.   *   *   *

"*Q.* If there had been a man on the head end of your train signaling you with a light you would not have moved the flat cars at all would you?

"*A.* No, I guess not.   *   *   *

"*Q.* You say if a man was on the head end you would not move the flats?

"*A.* Yes, sir.

"*Q.* What do you mean?

"*A.* We would be going so much slower."

It has often been held in the Federal courts that one who claims under the Federal employer's liability act must establish both the negligence of the defendant and the causal connection between such negligence and the injury. *Atchison, etc., R. Co.* v. *Toops,* 281 U. S. 351 (50 Sup. Ct. 281). But from the above-quoted testimony and other like portions of the record we find there was evidence of a causal relation between the alleged negligence and the injuries sustained by the decedent, and therefore a question for the jury was presented.

The charge to the jury presented a fair statement of the law applicable to the controverted issues of fact, and covered with sufficient fullness the questions of assumed risk, contributory negligence, and proximate cause. Except as hereinafter noted, ap-

pellant's brief discusses no error in the charge of the court except that of failure to define proximate cause. While that expression was not defined by the circuit judge in charging the jury, we think this phase of the law was sufficiently covered in the charge as follows:

"I charge you that if you find by a preponderance of the evidence that there was such a custom, that the defendant at the time of the accident had violated it, *and that this violation resulted in the death of plaintiff's intestate* then the defendant would be liable. If, however, you are unable to find by a preponderance of the evidence that this was the custom *and that the violation of this custom caused the accident,* your labors would cease, and it would be your duty to bring in a verdict of no cause of action."

It may be added that a proper request to define *proximate cause* was not presented, and that it was not until after the jury was placed in charge of the court officer for its deliberations and was retiring to the jury room that defendant's counsel orally called the court's attention to the fact that the term *proximate cause* had not been defined to the jury. Under these circumstances, failure to give a definition of proximate cause was not reversible error.

Appellant's contention that the verdict is excessive is based in part upon the erroneous assumption that "the record is totally lacking in any evidence of contributions by decedent" to the support of his family. At the time of his death Mr. Musgrove was 48 years of age, and his expectancy of life was 22.36 years. Previously he had enjoyed good health. He was survived by Mrs. Musgrove, whose age was 42 years, and by two minor children, one 10 and the other 16 years of age. It is stipulated that at the

time of his death deceased was earning $2,000 per year.   Mrs. Musgrove testified:

"*Q.*  Your husband during his lifetime supported you and your family all right?
"*A.*  He did.
"*Q.*  Do you know what he did with his money?
"*A.*  He gave his checks right to me.
"*Q.*  Gave his checks to you?
"*A.*  Yes, sir."

In the absence of any evidence to the contrary we think this was sufficient testimony to enable the jury to pass upon the question of pecuniary loss suffered by decedent's family.

In connection with this phase of the case, appellant also contends that the portion of the charge of the court relative to minimizing damages in a suit brought under the Federal law (45 USCA, § 53) in the event decedent was guilty of contributory negligence was inaccurate, and in consequence thereof the damages were not minimized by the jury as they should have been.   In this we cannot agree, but on the contrary we think the charge as a whole was free from prejudicial inaccuracies in this regard and was amply clear to enable the jury to make a proper application of the law to the facts in the case.   In view of the testimony as to pain and suffering, and that pertaining to decedent's earning capacity and his contributions to his family, it cannot be said as a matter of law that the amount of the verdict was excessive.

The judgment entered in the circuit court is affirmed, with costs to appellee.

CLARK, C. J., and MCDONALD, POTTER, SHARPE, FEAD, WIEST, and BUTZEL, JJ., concurred.