## NORFOLK & W. RY. CO. v. FRALEY.
### No. 6370.

Circuit Court of Appeals, Sixth Circuit.

March 6, 1934.

H. T. Bannon, of Portsmouth, Ohio (Ralph E. Clark and Burton P. Hollister, both of Cincinnati, Ohio, on the brief), for appellant.

M. L. Bernsteen, of Cleveland, Ohio (Bernsteen & Bernsteen and J. E. Mathews, all of Cleveland, Ohio, and Edward M. Bal- lard, of Cincinnati, Ohio, on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

WEST, District Judge.

Action under Federal Employers' Liability Act (45 USCA §§ 51–59) for injuries sustained by appellee while setting brakes on a cut of cars in appellant's yard at Portsmouth, Ohio. A claim that the Federal Safety Appliance Act (45 USCA § 1 et seq.) was violated was withdrawn after the evidence was in.

The yard in question extends east and west, is operated by gravity, and equipped with mechanical retarders. In making up west-bound trains the first car is put over the hump and ridden down to its desired position on one of the many yard tracks, where its brakes are firmly set. Thereafter other cars are added, but the action of the retarders slows them down so they strike the standing car or cars with slight force and need no men to control them. Though brakes are customarily set on several cars, the drafts sometimes escape from the track, and run out on the lead track to the west. It then becomes necessary for a crew to couple to the cut and push it back eastward on the yard track, well in the clear, and again set sufficient brakes to hold it in place.

A rule governing this movement provided: "Yard crews, in shoving cuts of cars back in the westbound yard at Portsmouth when the hump is in operation, will place a man on the rear car to protect this move."

On the night of October 7, 1930, about 11:15, while he was setting the brakes on the two westward cars of such a cut of some twenty loaded cars of coal which were being replaced on track No. 25, the appellee was thrown to the ground by the sudden stopping of the cut and seriously injured. He asserted liability for appellant's negligence in causing the cut to collide with cars upon track No. 25, and in failing to provide a man upon the rear of the draft as required by the rule, and the jury gave him a verdict.

At the conclusion of all the evidence appellant moved for a directed verdict, and the court's denial of this motion is made the sole ground of complaint here.

It is contended that as the accident occurred after the engine had been cut off and ceased "shoving," the rule did not apply. We think the rule includes the complete move-

ment until the cut is stopped and secured in place, and not merely that portion of the movement which occurs while the locomotive is attached and pushing.

■ Appellant claims the testimony is insufficient to establish that an unusual jerk or shock was the cause of the accident. On this point Fraley was the sole witness. He says he got on the second car from the west end of the cut and set a brake and then turned to set the adjacent brake on the first or lead car, but before this was completed and "while still moving east we came into collision with the moving cars. I heard a sound from the east.. An instant after the crash they came to a violent stop. They stopped suddenly and jerked me loose, turned me around and my face hit the head end of the second car. The stop and the crash were unusual. It knocked me off." And on cross-examination, that when the engine was uncoupled, they were moving about as fast as one could walk and upgrade, but after he set brakes the speed may have been a little reduced; that such a cut with brakes set and moving four or five miles an hour would not stop at once of its own accord; and that they stopped "awful quick," as evidenced by the fact that they immediately started to move back westward.

This appears quite sufficient, if believed, to show a very abrupt and an extraordinary jerk of the car on which Fraley stood. Gulf, etc., R. Co. v. Wells, 275 U. S. 455, 48 S. Ct. 151, 72 L. Ed. 370, cited by appellant, is not in point, for there the brakeman was not on the train, or in position to compare with any accuracy the jerk he then felt, with others previously experienced. Slocum v. Erie R. Co., 47 F.(2d) 216 (C. C. A. 2).

■ No one was on the rear car of the cut, as the rule required, and although appellee looked for a man and saw none, yet he did not assume the risk, for it was entirely possible for the lookout to be on the side of the car and out of Fraley's view. It seems unnecessary to cite authorities to show that before appellee can be said to assume such an unusual risk as the violation of the rule, knowledge of the absence of the lookout must be brought home to him.

■ The debatable question presented is whether there was sufficient evidence to go to the jury in support of appellee's claim that the cut on which he was setting brakes collided with other cars permitted to come over the hump. No witness saw such a collision, and the testimony of appellee that there was one, was merely his inference or conclusion. In a signed statement given the company the day following the occurrence, he said that as he was tightening the second brake the slack in the cars ran back to the west, the cars moved about a foot, the brakes fouled in some way, let loose and turned, he "grabbed twice for the wheel and missed it," his head struck the end of the next car, and he fell headfirst between tracks 25 and 26. On the stand the appellee insisted that in certain minor respects the statement which the other side introduced, was not as he had given it, but was not asked what he had said to the person who took the statement about the slack running out. Counsel interrogated thus:

"Q. The cars moved about a foot when the slack run out on them. Do you remember the slack running out? A. No, sir.

"Q. Is that a fact, moved about a foot? A. No, sir, the slack never ran out."

For the railroad company Brakeman Salmons, who, by the rule quoted, was required to protect the eastward movement of the cars, testified that instead of riding the east end of the cut, he boarded a car on track 26 adjoining No. 25, near the east end of the cut before it was shoved back, and from that point observed the movement and that the cars struck nothing and nothing struck them. No other witness testified directly as to a collision or its absence.

This testimony of Salmons, if not contradicted, precluded the inference of a collision. See Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 340, 341, 53 S. Ct. 391, 77 L. Ed. 819. The position of the witness on top of the car on track 26 was about 800 feet west of the east end of the cut at the time of the accident, but the yard was well lighted and he could have seen the condition of track 25 up to the hump.

But the evidence raises a serious question as to whether he remained in this position until the accident occurred; and permits a strong inference that prior thereto he descended from the car on No. 26 and thereafter for a substantial time could not see what happened.

Jones and Salmons were brakemen of a crew whose final duty of their trick ending at 11 p. m. was to take six or seven cabooses to the caboose track, and to do this it was necessary to get the escaped cut off the lead. Their locomotive was attached to the west end of the cabooses, the eastern of which was coupled to the cut. Jones testified that he rode this caboose as the cut was pushed back on track 25 and when it had proceeded about twenty car lengths Fraley boarded the caboose with him and then Salmons also got

on. We understand this was before the cut stopped and before the accident, for the witness said that "when the caboose came along Salmons got on with us." Jones further testified that Salmons gave a stop signal from the engineer's side (not locating Salmons at that moment) while he gave the fireman a similar signal; that the cars were moving slowly when the engine and cabooses were detached and Fraley started to climb on the cut; that the locomotive stopped and stood a minute or so, when he and Salmons signaled to back out and proceed to the caboose track, and both accompanied the caboose while Fraley remained with the cut. On cross-examination Jones testified that when he cut the cars from the caboose "the other brakeman" (evidently Salmons) was on the caboose. On direct the engineer testified that when the cut was shoved back in the clear, "I got a signal to stop, from, I believe, Salmons." And on cross, referring evidently to this signal: "I think I got the signal from Salmons who was on the head end of the caboose on the right side. He was standing on the track in the yard, about the head end of the caboose, on the ground. I don't think he was on top of a car on track 26. He was standing up there on the ground." Notwithstanding Salmons' statement that the cut struck nothing, we think it was so seriously weakened by this testimony of his fellow employees that inference of a collision remained open to the jury if it saw fit to draw it and if such inference was permissible.

It remains to be decided whether on the entire record taken in its aspect most favorable to appellee there was substantial evidence of a collision, or whether the cause of the accident was left wholly in the realm of conjecture and speculation. The appellee's testimony has been recited. The crash ahead, the violent and unusual stop which jerked and turned him about face and knocked him from the car, the retrograde movement of the cut of loaded coal cars with one brake set, certainly point to a collision at the east end of the cars. Probably nothing could be inferred from the crash alone, for such sounds are to be expected in railroad yards. But in conjunction with the other physical facts it should have some force. Cars without riders were likely to be sent down the track at any time, and how far they would run depended on circumstances; but the grade descended to the west and they would at times go out on the lead.

This cut had shortly before passed over the western portion of track 25 without interference. We have no right to infer the presence upon such a track of any obstruction for which the railroad was not responsible, as might be the case were a highway crossing involved. The cars composing the cut were in running order and were moving, and no inference is permissible that the stop was caused by any sudden breakdown. It is not a case where several inferences are equally open from the proof, and only two causes are suggested, collision or the running back of the slack; and positive testimony appears which, however weakened by appellee's prior statement, was not destroyed for the purposes of the motion to direct, and, if believed, excluded the second cause. No cause other than these two appears fairly inferable from the facts as the jury was permitted to find them. We think the result below does not "remove trial by jury from the realm of probability, based on evidence, to that of surmise and conjecture." Atchison, T. & S. F. Railway Co. v. Toops, 281 U. S. 351, 357, 50 S. Ct. 281, 283, 74 L. Ed. 896.

In reaching this conclusion we have not taken into account the evidence of Conductor Ball, who testified that his crew while waiting on an adjacent track between 10:40 and 11 o'clock on the night in question observed cars being sent down track 25, for these might have been the very cars going to make up the cut which later escaped. Nor do we give weight to the fact that according to Fraley's count before the accident there were 20 cars in the cut, and witnesses hint at 22 or 23 being noticed after the accident, for no one is shown to have actually counted the cars after the occurrence. The fact that the railroad company furnished no evidence as to whether or not cars in addition to those composing the cut were sent down on track 25 is ignored, there being no showing that the company had means of giving this information.

Even with the foregoing matters omitted we regard the evidence as sufficient to take the case to the jury, and the action of the District Court is affirmed.