## FORT WORTH & DENVER CITY RY. CO. v. SMITH.

### No. 14135.

United States Court of Appeals
Fifth Circuit.

Aug. 18, 1953.

Rehearing Denied Oct. 8, 1953.

---

H. M. Muse, Stanley C. Kirk, Wichita Falls, Tex., Seth Barwise, Fort Worth, Tex., for appellant.

Bob L. Wilson, Philip S. Kouri, Wichita Falls, Tex., for appellee.

Before HOLMES, BORAH, and RUSSELL, Circuit Judges.

BORAH, Circuit Judge.

This action was instituted by appellee, who is the administratrix of the estate and the widow of the deceased R. E. L. Smith, under the Federal Employers' Liability Act.[1] Recovery was sought for the alleged wrongful death of Smith during the course of his employment as a switchman and engine foreman in one of appellant's railroad switching yards. The case was submitted to a jury, which returned a verdict in favor of appellee and awarded her damages of $6,600.00. The District Court entered judgment accordingly. Appealing from this judgment appellant contends that the District Court should have directed a verdict in its favor for the reason that appellee failed to adduce any evidence of probative force to show that appellant was negligent, and that in whole or in part Smith's injuries and death resulted proximately therefrom.

The important question before us is whether there was sufficient probative evidence, with the inferences that the jury could draw from it, to support the verdict for the appellee.

Smith was employed as a switchman and engine foreman in appellant's switching yards in Wichita Falls, Texas. The switching yard covers an area of 35 acres on which there are numerous tracks. In addition, the railroad owned and used an additional 16 acres on which there were no tracks and Smith, who had worked for the railroad for about 39 years, performed his duties over the entire area. These yards comprise six tracks which extend in a generally easterly and westerly direction. The yard tracks were numbered from the south to the north. The depot was located at the westerly end of the yards. The "switch shanty", where the employees assemble before going to work, was located north of track 6 at a point about one block north and east of the depot. In front of the depot and between tracks 2 and 3 and between tracks 4 and 5 there were platforms flush with the rails which were used principally, though not to the exclusion of employees, for loading and unloading passengers and for the movement of baggage and express trucks. In the immediate depot area these platforms were constructed of brick. In the area adjoining to the east they were constructed of wooden boards. None of these wooden platforms or board walks lead to the "switch shanty" which is about 55 feet from where the board walk between track 4 and 5 ends. Between the tracks, except where they have these platforms, the area is covered with cinders and gravel.

When the deceased arrived at the depot at about 8:30 A.M. on the morning of January 11, 1949, preparatory to reporting for work the temperature was freezing and the entire yard area was covered with snow, ice and sleet. This condition had existed

that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' "

1. 35 Stat. 65, as amended; 36 Stat. 291. 53 Stat. 1404; 45 U.S.C.A. § 51.

continuously for the past 30 hours. The records of the U. S. Weather Bureau reveal that from 12:10 A.M. January 10, 1949 to 12:10 P.M. of the following day that there was .34 of an inch of precipitation; that there was continued rain and mist during a part of each six-hourly period and that the temperature never rose above 26°.

An operating safety agreement between the railroad and its employees required that all sidewalks be frequently inspected and that dangerous places be repaired at once; "that all necessary assistance must be given to remove snow from platforms or walks to the passenger stations"; and that all crossings must be kept free from snow, ice, and other obstructions. It further appears that although it was the custom to spread salt or sand or cinders over these areas when it would sleet or snow, no such precautions were taken on the morning in question except in front of the depot where the passengers get off the trains. Corlett, a witness for appellant testified that a crew of ten men could in 4 or 5 hours cover the entire 35 acre switching yard with salt. But, in the opinion of the witness it would be problematical whether it would stay, if precipitation continued and the temperature remained below freezing.

When the deceased alighted from the automobile in which he had been driven to the depot on the morning of January 11 he started walking towards the east and when last seen, prior to his injury, was walking in the track area headed for the switch shanty. When next seen he was lying on the ground close to track number 3. There was no eye witness to the occurrence of the accident. There was no direct evidence—not even a res gestae statement—as to the manner in which Smith was injured. However, the evidence does show that the graveled area in which he was found was very slick. It also shows that Smith had a chronic tired heart.

The gist of this action is the alleged negligence of the appellant in failing to keep its yards free from ice, sleet and snow, which caused the injuries and resultant death of the deceased. The jury, under the charge of the court, necessarily found that the appellant was thus negligent. If, then, there was any evidence of probative force to establish such negligence, the appellant's motion for a directed verdict was correctly denied.

It is a general rule that a railway company is not liable to its employees for injuries resulting from climatic conditions, such as ice and snow; but within its yard limits it must exercise a degree of care commensurate with the risks to prevent the accumulation of snow and ice in such quantity, form, and location as to be a menace to the safety of its employees working in its yards. The employer is not, however, the insurer of the safety of his employee, and the test is whether reasonable or ordinary care has been exercised by the employer in that regard.[2] The duty of providing a reasonably safe place for the carrying on of the work is a continuing one and must be exercised whenever circumstances demand it.[3] As stated by the Supreme Court in Patton v. Texas & Pacific Ry. Co., 179 U.S. 568, 21 S.Ct. 275, 45 L.Ed. 361, it is a duty which becomes "more imperative" as the risk increases.

There was in our view sufficient evidence to go to the jury on the question whether, as alleged in the complaint, appellant was negligent in failing to use reasonable care in furnishing Smith with a safe place to work. However, assuming there was negligence in this respect, that in and of itself was not sufficient to take the case to the jury.

Under the Federal Employers' Liability Act proof of negligence alone does not entitle the plaintiff to recover. It was incumbent on appellee to prove that appellant was negligent and that such negligence was the proximate cause in whole or in part of the injuries and death of deceased. Appellee was required to present probative facts from which the negligence

2. Baltimore & O. S. W. R. Co. v. Carroll, 280 U.S. 491, 50 S.Ct. 182, 74 L.Ed. 566.

3. Kreigh v. Westinghouse, Church, Kerr & Co., 214 U.S. 249, 256, 29 S.Ct. 619, 53 L.Ed. 984.

and the causal relation could reasonably be inferred. "The essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Galloway v. United States, 319 U.S. 372, 395 [63 S.Ct. 1077, 1089, 87 L.Ed. 1458]; Atchison, T. & S. F. Ry. Co. v. Toops, 281 U.S. 351 [50 S.Ct. 281, 74 L.Ed. 896].

This brings us to the crucial element in the case—whether such negligence was the proximate cause in whole or in part of the injuries and death of deceased. There were no eye witnesses to the accident and no one can say with certainty how it occurred or that death resulted therefrom. When last seen prior to the accident the deceased was walking across the track area in the direction of the switch shanty. Young who was unloading express from a baggage car on track 4 heard someone holler and walked to the south end of the car he was unloading and found Smith lying on the ground between the tracks in close proximity to track number 3. Young testified that the graveled area where Smith was lying or sitting was very slick but he could not tell the exact spot where Smith fell or whether or not he had moved while sitting there. Help was summoned and Smith was taken to the hospital in an ambulance where he remained for twenty days. On April 11, 1950, approximately fifteen months after the accident Smith who was then wearing a Taylor brace consulted Dr. Walker complaining of his back. As this was his only complaint he was examined and x-rayed for the purpose of ascertaining the nature and extent of bone structure involved. The x-ray examination revealed a definite fracture of the second lumbar and first dorsal vertebrae and apparently some disorganization in the third, fourth, fifth and sixth cervical vertebrae. After the initial visit Dr. Walker saw Smith professionally at intervals for a short while, possibly three to six times, but on none of these visits did he make any examination or tests to determine if Smith had any other physical disabilities or any diseases as he was concerned only with his back injuries. Dr. Walker never saw Smith after the last of this series of visits.

On November 29, 1950, more than twenty months after receiving his injuries Smith died. The evidence shows that he died from cirrhosis of liver due to carcinoma of liver and as a condition contributing thereto, chronic myocarditis. Dr. Harrison the attending physician made this diagnosis and it was verified by an autopsy. This testimony is the only testimony that is to be found in the record with reference to what actually caused Smith's death. Dr. Harrison further testified that the injuries to Smith's vertebrae did not in any manner contribute to the condition which caused his death; that as far as he knew, "no injury brings these conditions on" but that "these conditions are usually brought on by dietary insufficiencies and many factors unknown."

The appellee offered no evidence to prove that Smith's death was not caused by cirrhosis of the liver due to cancer of the liver, the antecedent cause. Nor did it offer any evidence to prove that there was causal connection between the injury and the cancer which caused death. However, appellee did ask Dr. Walker for his opinion as to "what" caused Smith's death and the response was "I prophesied he was going to, in a reasonable time, he was badly hurt, and I thought he *might* die any time." The statement of the doctor that Smith "might" die from his back injuries does not seem to us to dispense with the necessity of testimony—nowhere found in the case—that Smith did so die. The testimony must establish a probability, not a mere possibility of such causal connection. The testimony to the effect that the injury might have resulted in death does not meet that test and was not sufficient to require the case to be submitted to the jury where, as here, there are no evidential facts in connection with the medical testimony which could form a foundation for the jury's judgment not dependent upon speculation and guesses.

The judgment is

Reversed.