ALFRED E. PUFFER v. CHICAGO GREAT WESTERN RAILWAY COMPANY.[1]

June 30, 1896.

Nos. 9935—(236).

**Injury to Employe—Assumption of Risk.**

Plaintiff, while employed as a brakeman by defendant in its switch yard, coupling an engine to a train of freight cars, received an injury by having his hand caught between the bumpers. He claims that it was caused by the negligence of the engineer in jerking or suddenly stopping and starting the engine while plaintiff was standing on the footboard at the end of the tender, stooping over (without having a hold of the hand rail) and attempting to make the coupling, while the engine was still in motion, approaching the car, and that such sudden stopping or jerking threw him off his balance, causing him to throw his hand on the bumper of the car, where it was caught by the bumper of the engine before he had time to take it away. *Held*, there was no evidence to show that such sudden stopping or jerking was anything more than ordinarily occurs in the business of switching and coupling cars, the risks of which plaintiff assumed, or to show that the engineer was negligent, and plaintiff cannot recover.

Appeal by defendant from an order of the court for Hennepin county, Belden, J., denying a motion for a new trial on condition that plaintiff consent to a reduction of the verdict to $2,000.   Reversed.

*J. F. McGee*, for appellant.

*F. D. Larrabee*, for respondent.

CANTY, J.   This is an action for damages for personal injury. Plaintiff had a verdict, and from an order denying a new trial defendant appeals.   The only question which we will consider is whether or not the verdict is sustained by the evidence.

On May 14, 1894, plaintiff was in the employ of the defendant railway company at Minneapolis, as a yard brakeman; and, in attempting to couple a switch engine to a train of freight cars on that day, his hand was caught between the bumpers, his thumb cut off, and his hand otherwise injured.   The engine had just brought the train of cars from another yard, and in doing so the tender end of the engine was run forward, the engine ahead of the train.   On arriving at the

[1] Reported in 68 N. W. 39.

yard the engine was uncoupled and run past the switch. Then the train of cars was, by the action of gravity, dropped in on the switch, and run some distance down the same. The engine then followed, plaintiff riding on the pilot end, which was behind. When the engine was about four car lengths from the train, it was stopped. Plaintiff got off, came around to the tender end of the engine, which was ahead, and stood on the foot board, ready to couple that end of the engine to the rear end of the train of cars. Thereupon the engineer let the engine drop down, by the action of gravity, towards the train.

Plaintiff claims that when he, standing on the footboard, approached within from two to four feet from the drawhead of the car, he reached out and caught the link, when the engine was suddenly reversed and jerked back, which caused him to lose his balance, and in order to save himself he caught the bumper of the car, and that then the engine again came forward and caught his hand between the bumper (or Janney coupler) of the car and the bumper (or "nigger head") of the engine. He claims that the injury was caused by the negligence of the engineer in reversing the engine several times while going an exceedingly short distance, and that defendant is liable. We are of the opinion that the evidence does not sustain the verdict.

A brakeman working in a switch yard, coupling cars and riding around on a switch engine or cars, must expect some amount of sudden stopping, starting, jerking, and slacking of speed of the engine or car on which he is riding. He assumes the risk of a reasonable amount of this when he engages in the business. He is not a passenger entitled to an extraordinary degree of care in having the train completely stopped and kept stationary while he is getting on or off, or moving about, under the direction of the railway company. While the evidence of plaintiff's witnesses tends to prove that there was a sudden interruption in the movement of the engine when within a few feet of the car, and another sudden movement forward against the car, still, from the conditions testified to, it is impossible that these changes of movement were anything more than the ordinary stopping, starting, and jerking of the cars and engine which were constantly taking place in the switching and coupling of cars.

On the trial, plaintiff testified as follows:

"Q. Who was it that caused the engine to start after you got around on the footboard? A. Mr. Wright, the engineer. I gave the signal

to back up.   *   *   *   Q. What did he do in pursuance of that signal?   A. Let the engine drop back.   *   *   *   Q. It was on a grade? A. Yes, sir; the grade was down towards the car.   Q. What rate of speed did he start to back up with?   A. Very slow.   *   *   *   Q. From that time, after you gave him the signal to back up until after you received your injuries, state whether or not you gave the engineer any other signal.   A. I did not.   Q. What did you do?   A. There was a Janney coupler in the car we were coupling onto, and there was a link in it, and I pulled the pin on the engine with my right hand, and when we were within three or four feet of the car, I reached out and caught the link with my left hand; and when I was in the act of entering the link the engine swerved or jerked away from me, causing me to lose my balance and to throw my whole weight on my left hand, and before I could recover myself the engine jumped back against the cars, and caught my left hand between the Janney coupler, which was the drawbar on the standing car, and the 'nigger head,' which was the draw on the engine.   I don't know of my own knowledge what did cause the engine to jerk.   I had not given any signal to the engineer at that time.   *   *   *"

Cross-examination:

"Q. Supposing, in the judgment of the engineer, he is coming back too rapidly; does he have a right to check his engine?   A. Why, certainly he has.   *   *   *   Q. If, in his opinion, his engine is coming back too rapidly against a train of cars, hasn't he a right to check that engine without consulting the wish of the switchman?   A. Yes, sir; if he is too close to the cars.   *   *   *   Q. How far was the tank end of the engine from the Janney coupler on this car it was about to be coupled onto, when you first noticed any movement of the engine in the way of checking or starting?   A. That was after I had taken hold of the link, and was almost in the act of making the coupling.   It wasn't more than three feet,—between two and four feet.   Q. What was the motion of the engine at that time? A. The engine lurched away from me, and I was leaning out.   Q. Were you leaning over the Janney coupler?   A. I was leaning over. I held the link in the Janney coupler, and the engine jerked away from me, and caused me to lose my balance and throw my weight on this link in the Janney, and that is all that held me.   And then the engine jumped against the car.   She came right against the cars before I could recover my balance and get out of the way,—get my hand off the link.   Q. When she jerked, how far away from the cars did she jerk?   A. She didn't jerk away from the cars.   She just swerved.   I don't know whether she stopped, or whether she jerked away from the cars, but she didn't go any distance.   I don't think she went six inches.   I don't know.   It was all done so quick, I don't know.   Q. Then it was thrown the other way, and came back?   A. Yes, sir; there was a heavy iron railing that went across the back of the engine, running from one side of the tank to the other, standing out from the end of the tank about four inches, and was

about as thick as that gas pipe there. Q. What was that on there for? A. It was on to have hold of,—to get on and off with. Q. Was it on there to enable switchmen to take hold of it in coupling cars? A. No; it wasn't. I swear to that. Q. It wasn't there for that purpose? A. It wasn't there for that purpose, and it wasn't used for that purpose by switchmen. * * * Q. If I understand you, it [the engine] was barely in motion. Is that so, or was it coming very slowly? A. Very slowly; yes, sir. * * * Q. How long did you say it was from the time the engine surged forward, as you say, until the backward motion came? A. The same instant,—just as though she had been thrown forward and back immediately, almost in one motion."

This is substantially all the evidence in the case to show that the engine jerked. Thomas Riley, the fireman at the time, was called as a witness by plaintiff, and testified that, when the engine was within the length of a car and a half of the end of the car, the engineer reversed the lever to the opposite direction from which the engine was running, and after running about a car length, or a half a car length, threw the lever back again, and again reversed it about the time the engine struck the car, when plaintiff cried out, indicating that he was hurt. But Riley nowhere testified that the engine jerked, or moved irregularly in any manner. He also testified that the engine ran very slowly down the grade, was running very slowly when the coupling was being made, and that neither he nor the engineer could see plaintiff at the time.

We have quoted the evidence at considerable length for the purpose of showing the character of case made by plaintiff. Plaintiff testified that he stood on the footboard of the moving engine, and, without steadying himself by holding onto the hand rail which extended along the end of the engine, he stooped forward while the engine was still in motion, and took hold of the link on the car. Surely a very slight jerk or slackening of speed of the engine would be sufficient to throw him off his balance while he was in this position. What else had he a right to expect that a careful engineer would do about that time, except to slack up or stop just as he reached the car to be coupled onto? Plaintiff's statement that the hand rail was not there to hold onto while he was standing on the moving engine, leaning over, counts for nothing. No court can hold that it was the duty of the engineer to stop the engine so slowly and evenly that it would not unbalance a man standing in that position.

65 M.—23

But, even if plaintiff did intend to convey the idea that there had been a violent and extraordinary jerking of the engine, his evidence does not show it. This ponderous engine, running slowly down this slight grade by the force of gravity, and with no steam in the cylinders, as all his witnesses testify, could not jump back from under him a few inches or a foot, and then jump forward again and strike the bumper of the car with all the agility of a cat; the space crossed by the jump being so short that plaintiff's feet rested all the time on the footboard of the engine, and his hand on the bumper of the car, and the time of the double jump of the engine being so short that he, an able-bodied man, competent and fit for the business, did not have time to raise up and regain his balance, or take his thumb out of the way. Of course, if the engine struck some ponderous obstruction, such as this train of cars with the slack all taken out from between them, the engine would be very likely to recoil as quickly as plaintiff claims it did; and, if he was standing in the position he says he was, he would be very likely to lose his balance as he says he lost it. But he could not recover in that case, as the engine would not, at the rate it was moving, be stopped any more suddenly or violently, or with any less care, than it is usually stopped when it strikes against the cars to which it is being coupled.

The only persons who were about the engine, to testify to what occurred, were the plaintiff; the fireman, Riley; and the engineer, Wright. The latter testified for defendant that there was no jerk or interruption at all, but the engine moved down slowly until the bumpers struck, and plaintiff called out in distress. Then, taking the testimony of plaintiff and Riley alone, it does not show that there was any extraordinary jerking of the engine. Riley nowhere testifies that the engine jerked, and plaintiff's statement that it gave the short, double-action, six-inch jerk cannot be given any effect beyond showing that there had been an ordinary slacking, jerking, or stopping of the engine about the time that the engineer might reasonably suppose that the bumpers would strike. He could not see the coupling apparatus or the plaintiff, as the latter was standing down on the footboard below the end of the tender. Therefore the engineer was not likely to make a very close guess as to the exact distance he should move the engine, and might well stop or slack up before reaching the point where the coupling could be made; and, if the plaintiff stood in

the position he says he did, this would naturally throw him off his balance. But the fact that he was so thrown off his balance while in that position is not sufficient to show that the engineer was negligent. Indeed, it would be an extraordinary engineer who could, every time he tried, run that engine down to that car and stop it so evenly and gradually that he could make the proper contact for coupling without unbalancing a man standing as plaintiff was on that footboard,— stooping over without having a hold on the rail.

Plaintiff called as an expert an engineer who testified that running an engine down grade by the force of gravity, with the lever reversed, will cause the pumping of air into the cylinders and stop the engine, and that when the lever is again reversed the compressed air in the cylinders will cause the engine to jump or jerk forward. But we cannot allow expert evidence as to what might happen to stand as proof of what did happen, especially as it is not probable that there was either momentum enough in this engine, or descent enough in this grade, to furnish sufficient motive power to compress enough air in the cylinder of this engine to cause her to do any more jumping or jerking than an engine ordinarily does in switching and coupling cars.

The order denying a new trial is reversed, and a new trial granted.