## WHEELOCK et al. v. FREIWALD.
### No. 9660.

Circuit Court of Appeals, Eighth Circuit.
July 19, 1933.

Rehearing Denied Sept. 13, 1933.

Charles M. Miller, of Kansas City, Mo., for appellants.

Roy W. Rucker, of Kansas City, Mo. (Clif Langsdale, of Kansas City, Mo., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and DEWEY, District Judge.

GARDNER, Circuit Judge.

This is an action brought by appellee as administratrix of the estate of M. J. Freiwald, deceased, against appellants, as receivers of the Chicago & Alton Railroad Company, to recover damages on account of the death of M. J. Freiwald. The action is bottomed on the Federal Employers' Liability Act (45 U. S. C. §§ 51–59 [45 USCA §§ 51–59]).

The parties will be referred to as they were designated in the lower court.

At the time of the accident resulting in the death of Freiwald, he was in the employ of the defendants as a switchman, and was working as a member of a switching crew in the Kansas City, Mo., yards of defendants, engaged with other members of the crew in shifting cars from and onto various tracks in the yards. Besides himself the crew consisted of another switchman, an engineer, a fireman, and a foreman. Freiwald had had many years' experience as a switchman.

The switch tracks involved in this action run north and south and slope slightly to the north. They were numbered 1 to 18, inclusive, and were cut or traversed by two lead tracks, from which each of the switch tracks might be entered. The particular lead track here involved crossed all the switch tracks in the yard at the south end of the yard. Just prior to the movement of the cars in which Freiwald was fatally injured, he had assisted in placing a box car loaded with lumber on switch track No. 11. Following this movement the crew picked up one refrigerator car and four loaded oil tank cars. They were on track 3 or 4 and were moved to the lead track so that the tank cars might be shunted onto switch track No. 11. The refrigerator car was next to the engine, which was pushing the cars in a northerly direction. The kicking or shunting operation is described as follows: The foreman gives a signal indicating the cars which he desires kicked onto the switch track. Thereupon the switchman following the cars operates the pin lifter, detaching or uncoupling the designated number of cars. The foreman then signals the engineer to shove or move the cars ahead.

When the engineer has attained a sufficient speed so that in the opinion of the foreman the cars desired to be cut off will roll to the place desired on their own momentum, he gives the engineer a signal to stop, and in compliance with this order the engineer stops the engine, and the cars which have been cut off roll onto the proper track.

In the switching movement here involved the foreman gave a signal to the engineer to stop, but the engineer did not see it. Two signals were given before the engineer stopped the engine. The foreman testified that the cars were moving about five miles an hour when he gave the first signal to stop and gained speed between the first and second signals, and gained very little speed between the second and third signals. He estimated that four to five seconds elapsed between the first and third signals. As the cars passed north, Freiwald was standing close to the switch from the lead track onto switch track No. 11. He threw that switch, and as the tank cars were passing the foreman directed him to "look out for the carload of lumber." This was understood to be an order for Freiwald to mount the tank cars and set the brake. The foreman, called as a witness for plaintiff, testified that he gave this order because the oil was heavy, and if the four tank cars should hit the one car of lumber, even though they were not going fast, the impact was liable to shift the lumber. He testified that, if the engineer had stopped on his first signal, the tank cars would have gone down there to contact the lumber car.

Freiwald, in response to the foreman's order, mounted the north end of the north tank car as it was passing him, in order to set the brake. The point at which he mounted the moving tank car was about 300 feet from the box car of lumber which had already been switched onto track No. 11. This was the last seen of Freiwald alive. His body was later found lying on track 11, midway under the fourth or south tank car.

The accident occurred about 6:40 a. m., March 17, 1929. It was daylight, but there was some smoke in the yards coming from the engines in use. It was a damp morning described by one witness as "not exactly foggy, but kind of misty." The dampness and dust had accumulated on the running boards of the tank car on which deceased stood in setting the brake, and this running board carried imprints of his heels. A witness, in describing these marks, said: "In examining this car we could see heel—his heel prints

where they had slipped out like that (indicating) off of the running board, these heel prints being right near the ratchet of the brake on the inside of the car just about over the drawbar, or as close to the ratchet as he could put them. They were * * * just about half way between the brake ratchet and the drawbar, right where he would be standing to have hold of the brake, and you could see that both heel prints slanted out right off of the running board here."

At the time the foreman directed Freiwald to board the tank car Freiwald was walking from north to south, so that the tank cars were moving toward him. After the tank cars came to rest, the north end of the north tank car was south of the south end of the car of lumber, the distance intervening being variously estimated at from three to forty feet.

A Mr. Nuzum, called as a witness for plaintiff, was the only witness testifying that the tank cars hit the lumber car. He testified that he saw a movement of tank cars, which he assumes were the cars in question, moving along between ten and fifteen miles an hour before they hit the box car. While not an employee, he was passing through the yards, and had been a railroad man of some experience. His observation of the moving cars was at an angle as they approached him. He testified that he saw a man on the tank car, apparently setting the brake, or working with the brake. At that time he was about one hundred yards from the cars. He could not see the man on the tank car at the time of the collision. The box car with lumber in it obstructed his vision so that he could not see the north end of the tank car before the collision. The testimony is somewhat obscure as to when his vision was obstructed, but we construe his testimony to mean that in his judgment he saw the north end of the tank car up to a point where it was about two car lengths from the south end of the box car of lumber. He did not see the man on the tank car at the time of the collision.

An examination after the accident disclosed that the brake on the north end of the tank car was set. An assistant yardmaster in the employ of defendants, called as an expert witness, testified that, after Freiwald had set the brake, the next thing, in the proper and ordinary discharge of his duty, was to have gotten off the car, or, if the car was moving too fast, he should, in the usual course of his work, have gone to set another brake. This testimony is not disputed.

After the accident, an examination disclosed that there was nothing wrong with the box car containing the lumber on track No. 11. The lumber had not been shifted, and there was testimony to the effect that ordinarily, if the impact had been of sufficient force to cause the lumber to shift in the box car, the end of the car would have broken out.

At the close of all the testimony defendants moved for a directed verdict, which motion was overruled, and the case was submitted to the jury, the jury returning a verdict for plaintiff. From the judgment entered thereon, defendants have appealed. The appeal presents for consideration three questions: (1) Was there substantial evidence that the death of plaintiff's intestate was caused by defendants' negligence; (2) was the risk causing Freiwald's death assumed by him as an incident of his employment; and (3) was the plaintiff the surviving widow of Freiwald?

■ The Federal Employers' Liability Act does not make an employer an insurer of the safety of its employees, but to entitle plaintiff to recover the defendants must have been guilty of some act of negligence which was the proximate cause of Freiwald's death. Baltimore & O. R. Co. v. Berry, 286 U. S. 272, 52 S. Ct. 510, 76 L. Ed. 1098; Atchison, T. & S. F. R. Co. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896; Coyne v. Union Pac. R. Co., 133 U. S. 370, 10 S. Ct. 382, 33 L. Ed. 651; Reese v. Philadelphia & R. R. Co., 239 U. S. 463, 36 S. Ct. 134, 60 L. Ed. 384. Recognizing this rule, plaintiff contends that it was negligence for the foreman to order Freiwald to board the moving tank car, because the foreman should have known that a collision would occur. The case was submitted to the jury on that single issue of negligence.

■ There is nothing in the evidence tending to show that it was unusual or out of the ordinary for a switchman to mount a moving tank car to set the brake. Freiwald was an experienced switchman and knew, we must assume, not only how the work undertaken by him was ordinarily performed, but possessed, we must assume, the ordinary skill and ability to perform such work. It is contended, however, that the evidence tended to show that the cars were moving at an unusually high speed when the order was given. The foreman, testifying for plaintiff, testified the only reason he gave the order to set the brake was to check the speed of the tank cars so as to avoid damage to the box car loaded with lumber. A bumping or collision of these cars with the lumber car was to be anticipated. There is, however, nothing to indicate that the bumping or collision to be expected after the brakes were set would be or was an unusual one, or that it would result in a jar or jerk out of the ordinary, or in any way dangerous to an experienced switchman on the car. It appears from the record that, in switching movements, switching crews are engaged in detaching cars from certain aggregations of cars, connecting them again to others, and at the time of impact as the cars are brought together a member of the crew is ordinarily on the cars. There is no substantial evidence that ample time was not allowed Freiwald to set the brake and use the facilities of the car to get off it, or to pass to another car and set an additional brake on it, as the testimony shows was customary, or, anticipating a jar or shock from the collision, to get a firmer hold than his position at the brake afforded. There is nothing in the evidence indicating that the foreman should have anticipated that Freiwald could not or would not do one of these usual and ordinary things.

It is contended by plaintiff that the injury was caused by the impact of the cars, but there is nothing to show that this impact was an unusual one, or out of the ordinary, or of a different nature than that generally encountered in switching operations. No one testified that the shock of the jar or impact was greater or more severe than the usual or ordinary jar arising from such work.

■ It was the duty of defendants to use reasonable care to protect their switchmen from danger in the execution of their orders, but in the absence of negligence they cannot be held liable. Coyne v. Union Pacific R. Co., 133 U. S. 370, 10 S. Ct. 382, 33 L. Ed. 651. The mere fact that Freiwald was injured while acting under an order to mount these cars and set the brake, which, so far as the evidence discloses, was of a simple everyday character, does not make the defendants liable, even though the work was dangerous, because it was the regular work or business of defendants, and plaintiff's intestate was not inexperienced.

The work which Freiwald was ordered to do was customarily done by switchmen in the way that he was ordered to do it. The evidence of the physical condition of the box car of lumber refutes the inference that the impact was an unusual one. The absence of evidence that this shock or impact was greater or more severe than the ordinary shock re-

sulting from such a movement also refutes the inference that the accident was caused by the impact, but tends, rather, to show that it was caused by a slipping from the running board while setting the brake. Nuzum did not see Freiwald on the car at the time of the collision, and even his testimony is consistent with the theory that Freiwald slipped and fell from the car before they came together. The position of his body when recovered, taken in connection with all the other testimony, leads strongly to the inference that he fell from the car while attempting to set the brake, and before the collision.

█ A verdict cannot be permitted to stand, which rests upon conjecture, surmise, or speculation, but plaintiff must produce substantial affirmative proof that the negligence of the carrier caused the injury, and "where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover." Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 393, 77 L. Ed. 819; New York Central R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; Atchison, T. & S. F. R. Co. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896; Patton v. Texas & P. R. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Southern R. Co. v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239.

█ It follows that the evidence was insufficient to establish the fact that it was negligence in the foreman to order Freiwald to board the moving tank car for the purpose of setting the brake thereon, or that Freiwald's death was caused by a collision between the tank car and the car of lumber with which it is alleged to have collided. This will necessitate a reversal of the case, but as a new trial must be granted something more needs to be said on the questions presented.

█ It is contended by defendants that Freiwald's death resulted from a risk which as a matter of law he must be held to have assumed. The defense of assumption of risk is available under the Federal Employers' Liability Act. The risks assumed by an employee are those ordinarily incident to the discharge of his duty in the particular employment, and also those not ordinarily so incident, but of which he has actual or constructive knowledge, with full appreciation of the danger that may flow therefrom. Seaboard Air Line Ry. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Chicago, R. I. & P. R. Co. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430; Delaware, Lackawanna & Western R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578; Northwestern Pacific R. Co. v. Fiedler (C. C. A. 9) 52 F.(2d) 400; St. Louis Cordage Co. v. Miller (C. C. A. 8) 126 F. 495, 63 L. R. A. 551; Chicago & E. R. Co. v. Ponn (C. C. A. 6) 191 F. 682; Narramore v. Cleveland, etc., R. Co. (C. C. A. 6) 96 F. 298, 48 L. R. A. 68.

█ As has been observed, Freiwald was employed as a switchman. He was an experienced workman. The work in which he was engaged of necessity contemplated the movement about and shunting of cars on the switch tracks. This work ordinarily involved more or less jarring, jerking, and bumping, caused by cars coming in contact. Slocum v. Erie R. Co. (C. C. A. 2) 37 F.(2d) 42; Puffer v. Chicago G. W. Ry. Co., 65 Minn. 350, 68 N. W. 39; Roach v. Los Angeles & S. L. R. Co., 74 Utah, 545, 280 P. 1053, 1061; Louisville & N. R. Co. v. Greenwell's Adm'r (Ky.) 125 S. W. 1054; Baker v. Beattie (Tex. Civ. App.) 222 S. W. 658. There is nothing in the evidence to show that in this case there was any unusual or unnecessary jarring, jerking, or bumping, or that the collision between the cars was so violent as to show want of ordinary care. The risk, so far as appears from the evidence, was ordinary and obviously incident to the work which Freiwald was performing, and, if we assume that his fatal injury was attributable to the collision between the cars, the danger was one assumed by him in entering the employment, and, hence, the defendants are not liable under the well-settled rule that an employer is not liable to his employee for injuries that are attributable to risks or dangers assumed by the employee. Boldt v. Pennsylvania R. Co., 245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385; Ozark Smelting & Mining Co. v. Silva (C. C. A. 8) 255 F. 821; Union Pacific R. Co. v. Marone (C. C. A. 8) 246 F. 916; Narramore v. Cleveland, etc., R. Co. (C. C. A. 6) 96 F. 298, 48 L. R. A. 68.

[9] Plaintiff urges that the evidence shows that the cars were going faster than they ought at the time the engine stopped. It is alleged in plaintiff's petition that the cars were going from five to six miles an hour. The foreman, testifying as a witness for plaintiff, testified that when the engine stop-

ped the cars were going from five to six miles an hour. Plaintiff's witness Nuzum, notwithstanding the allegations of plaintiff's petition, and the testimony of plaintiff's other witnesses to the contrary, testified that the cars in his judgment were going from ten to fifteen miles an hour. Certainly, Freiwald was in better position to judge the speed of the cars than was Nuzum, and, if the cars were going at an unusual or dangerous rate of speed, it seems clear that, if the danger was obvious to the foreman who gave Freiwald the order, it was equally obvious to Freiwald. The foreman and Freiwald were not far apart when the order was given. Even an extraordinary risk, if obvious, is assumed by an employee.

The facts in the instant case are very similar to those presented in Roach v. Los Angeles & S. L. R. Co., supra, except that in the Roach Case the switchman boarded the cars without any order from the foreman. The court held that the switchman in so boarding the car assumed the risk of a collision that was imminent if it were an extraordinary risk. The court said:

"It, of course, is not disputed that, if the risk of boarding the car was one ordinarily incident to the work performed by the plaintiff, he assumed it. He, however, asserts that the risk was extraordinary or unusual, that it was one created or occasioned by the negligence of the defendant operating the car before and at the time it was disconnected at an excessive and negligent speed, and thereby the plaintiff was not afforded a reasonably safe opportunity or means to disconnect the car or to board it after it was disconnected. * * *

" 'Whether the risk was an extraordinary risk depended upon whether the speed of the train was greater than plaintiff reasonably might have anticipated; and this rested upon the same considerations that were determinative of the question of the engineer's negligence. If the jury should find, as in fact they did find, that the speed of the train was unduly great, so that the risk of boarding the engine was an extraordinary risk, the question whether plaintiff assumed it then depended upon whether he was aware that the speed was excessive, and appreciated the extraordinary danger; or, if not, then upon whether the undue speed and the consequent danger to him were so obvious that an ordinarily prudent person in his situation would have realized and appreciated them.' * * *

"So whatever negligence was committed by the defendant in operating the car at an excessive speed was fully known to the plaintiff when the car was disconnected, when he dismounted the engine, and when he attempted to board the car. Being a man of maturity and of experience, he must be held to know and appreciate the risk or danger of boarding a moving car, and if operated at an excessive speed, of which he has knowledge, the increased risk and danger created thereby are just as open and obvious to him as an ordinary risk in boarding a moving car at a reasonable speed.

"Further, there is no substantial evidence in the record to show that the speed of the car, when attempted to be boarded by the plaintiff, exceeded 10 or 12 miles an hour. And the evidence, without substantial dispute, shows that an experienced switchman can board a moving car with safety at such a speed. The only evidence that the car, when plaintiff attempted to board it, exceeded a speed of 10 or 12 miles an hour, was his testimony that, as he viewed the matter subsequent to the accident, and after what had happened, and as he viewed it on the witness stand, it was his judgment that the speed was from 15 to 18 miles an hour, and from whatever inference may be deduced that the car struck the oil tank car with such force as to tip or throw over the empty box car. In the nature of it, the legal probative effect of such testimony is of such doubtful quality as hardly to raise a conflict with the testimony of all the witnesses, including the plaintiff, who observed the speed of the car when he attempted to board it, that the speed was from 10 to 12 miles an hour, the speed at which the plaintiff testified he thought it was going when he attempted to do so. Certainly his riding the engine when the car was being moved from the tank, signaling the engineer to decrease the speed, knowing the speed when the car was disconnected, dismounting the engine, and waiting to board the car, gave him a much better opportunity of judging the speed than by, subsequently to the accident, considering and viewing what had happened."

We are of the view that Freiwald assumed the risk involved in mounting this moving car and setting the brake thereon.

It remains to consider the contention of defendants that the plaintiff is not entitled to maintain this action because she is not the surviving widow of Freiwald. Prior to her marriage to the deceased she had been married to one Fred R. Smith, and on April 25, 1924, she obtained a divorce from him in the

state of Kansas, where she was then residing. The decree of divorce provided that it was not to be absolute for six months from April 25, 1924. Section 60—1514, Revised Statutes of Kansas 1923, provides that every decree of divorce must show the day and date when the decree was entered, and that the decree shall not become absolute and take effect until the expiration of six months from said time. Plaintiff was married to Freiwald at Independence, Mo., on July 14, 1924. Common-law marriages are not recognized by the Missouri statute. Section 7300, Revised Statutes of Missouri 1919 (Mo. St. Ann. § 2975) and 1921 Session Laws of Missouri, p. 468 (Mo. St. Ann. § 2977).

It is contended that the Kansas statute postpones the effective date of a decree of divorce for six months after its entry, and hence, at the time plaintiff in form married Freiwald, she had not been divorced from Smith. The weight of authority is to the effect that, where a statute or decree of divorce prohibits remarriage within a prescribed time, and, within that period, the parties remarry in another state, if that marriage is not prohibited within the state where the marriage is performed, it will be upheld as a legal marriage in that state at least. The matter is peculiarly one of statutory regulation. The statute here involved is a statute of Kansas, and the Supreme Court of that state, in Durland v. Durland, 67 Kan. 734, 74 P. 274, 63 L. R. A. 959, in construing it, held that the marriage status was absolutely dissolved by a decree of divorce, except that the parties were prohibited from remarrying within a period of six months. This construction of the statute by the Supreme Court of Kansas is binding on this court.

The statute with reference to remarriage could, of course, have no extraterritorial effect, and, as the bonds of matrimony had been absolutely dissolved by the Kansas decree, there was no impediment to the parties remarrying in the state of Missouri. Reger v. Reger, 316 Mo. 1310, 293 S. W. 414; In re Leete, 205 Mo. App. 225, 223 S. W. 962; Green v. McDowell, 210 Mo. App. 517, 242 S. W. 168. The plaintiff was, therefore, the surviving widow of Freiwald, and as such entitled to maintain this action under the Federal Employers' Liability Act.

We conclude that the court erred in denying defendants' motion for a directed verdict, and the judgment is, therefore, reversed, and the cause remanded to the lower court, with directions to grant defendants a new trial.