## Weidekamp's Administratrix v. Louisville & Nashville Railroad Company.

(Decided June 19, 1914.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch No. 2).

1. Personal Injuries—Negligence—Evidence.—In an action for personal injuries there will be no presumption of negligence; and

where the evidence is so uncertain and unsatisfactory as to require surmise or speculation as to how the injury occurred there can be no recovery.

2. Personal Injuries—When No Recovery Can Be Had.—Where from the evidence in a personal injury action it is just as fair to assume that the accident happened because of a condition for which the defendant was not liable, as to assume that it happened because of a condition for which it was liable, there can be no recovery.

BENJAMIN F. GARDNER and EDWARDS, OGDEN & PEAK for appellant.

CHARLES H. MOORMAN, T. K. HELM and BENJAMIN D. WARFIELD for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

Frank Weidekamp was the foreman of a switching crew in the East Louisville yards of appellee on April 29th, 1911, and while so engaged on that day with his crew in taking from said yards to other yards in the city of Louisville a train of circus cars was run over and killed.

This is an action by his personal representative, alleging that he came to his death by reason of the negligence of the appellee, and asking damages therefor.

Upon the first trial a verdict for $8,000 was returned against appellee, but the court upon motion set that verdict aside and granted a new trial.

On the last trial at the conclusion of the plaintiff's testimony the court gave a peremptory instruction to find for the defendant, and from a judgment entered under that direction this appeal is prosecuted.

It is conceded that if the action of the lower court in directing a peremptory instruction on the last trial is erroneous there should be a reversal with directions to enter a judgment on the verdict rendered at the first trial.

Weidekamp was a young man, in good health, active and alert, and had been engaged by appellee as a switchman for 11 or 12 years.

The evidence as to how the accident happened was substantially the same upon both trials except that upon the second trial Rucker, who had been introduced by the defendant upon the first trial, did not testify, and Birg, a negro, who did not testify at the first trial, testified at the last.

The only negligence relied upon as causing the accident is that on the morning before the accident a crew of trackmen of appellee in repairing the tracks at the point where the accident occurred had taken from under the ties a lot of cinders and soft dirt and piled it along the track for a distance of sixty or seventy-five feet in a ridge from a foot to a foot and a half high, and that the decedent in attempting to board his train, while it was in motion, had in some way stumbled over or had been impeded by this ridge of dirt and cinders, and that it was the cause of the accident.

But it is the contention of the appellee (1) that it was not only its right, but its duty to keep its tracks in repair, as well for the protection of its employes as for the proper handling of the traffic, and that, therefore, even if the ridge of dirt was piled along the side of the track, it was merely a necessary incident to the maintenance and operation of the railroad, and was not, therefore, in any event negligence; and (2) that, even if it was negligence for this ridge of dirt and cinders to be where it was, giving the fullest effect to the whole evidence, it is neither shown directly nor by any fair inference that the ridge of dirt and cinders was the cause of the accident.

In our view of the case it is unnecessary to determine whether the existence of the ridge of dirt and cinders along the side of the track was negligence, and it, therefore, remains to be determined whether there is any evidence from which it may be fairly said that the ridge was the cause of the accident, and this, of course, involves an examination of the evidence on that question.

There were only four witnesses introduced upon either trial who saw the accident or any part of it, viz., Rucker, Kessler, Birg, and Harpring, and only the latter three testified upon the last trial.

Harpring states that he was superintending the unloading of coal at a distillery a short distance away, and was on lower ground than the place where Weidekamp was killed; that there were some cattle cars on a side track between where he was and the place of the accident, but by reason of being on lower ground he saw Weidekamp while the cars were running over him by looking under the cattle cars. In speaking of the accident to Weidekamp, he says:

"Q. Did anything happen to him on the 29th day of April, while you were up there? A. Yes, sir; he got

killed. Q. Did you see the accident? A. No, not all of it. Q. Just tell the jury what part of it you saw, if any? A. I saw the last several cars passing over his body as he was lying on the track. Q. On what rail of the track was his body when it was being run over? A. On the south. Q. Did you see him fall? A. No, sir.''

J. H. Kessler states that he was forty or fifty yards from Weidekamp when the accident happened, and describes it in this way:

''Q. I will get you to tell the jury just what happened, in your own way, just what you saw, to the best of your recollection? A. All I can say, Weidekamp tried to get on and must have slipped or missed the footstep, and fell down between them. Q. Will you please state positively about that, whether he missed his footstep? A. No, not particular, because that was done so quick, you know, you couldn't tell whether he missed his footstep or slipped. Q. You don't know about that. You don't know whether his hand slipped, or whether his feet slipped from the stirrup? A. No, sir. The Court: Which side of the car did he try to get on? The witness: The north side, between the northbound main and the southbound main. Q. Where was the train at the time he tried to get on, on the northbound main? A. On the southbound main. Q. The southbound main is the north track, isn't it? The Court: The northbound main, the train goes to Cincinnati on that? The witness: Yes, sir. The Court: And the southbound main brings the trains into Louisville and on South? The witness: Yes, sir. Q. On which side of the train was he, on the right-hand side or the left-hand side, going to Cincinnati? A. Going to Cincinnati. Q. Yes? A. He would be on the right-hand side; the train was coming this way. Q. He was on the right-hand side of the train looking towards Cincinnati, no matter how the train was going? A. Yes, sir. Q. Which side of the track were you on? A. The same side as Mr. Weidekamp. Q. Were you over next to the Elk Run Distillery or over on Mellwood? A. Next to the distillery. Q. That is the side he was on when he was killed? A. Yes, sir. Q. Did you see him make more than one attempt to get on that train? A. I think he made two, but never lost his hand-hold, is the way it looked to me.''

And again on cross-examination:

"Q. Now, you say it looked to you as if he made two attempts to get on, and missed the first one and then tried the second time? A. Yes, sir. Q. But held his hand-hold all the same? A. Yes, sir."

The colored witness Birg says:

"A. I was coming from the Elk Run Distillery with my team at the time he fell. I saw him when he fell. Q. How did you come from the Elk Run Distillery? A. Well, the Elk Run set south of where we were hauling coal there. South of the track our cars was on, and I had to come from south, coming north, and then turned east back of the watchman's shanty, to come along the line of track where our cars were at, going east. Q. When you turned to go east, were there any cars between you and the main track? A. No, sir; there wasn't no cars between me and the main track at all. Q. That is when you turned east? A. When I turned east; no, sir. Q. In which direction then did you drive in order to get to the coal cars, east or west? A. East. Q. You say you saw Mr. Weidekamp when he fell? A. Yes, sir. Q. How far away from him were you? A. About 20 or 25 yards, as near as I can come at it. Q. In which direction where you looking? A. I was looking at the show train, looking north. Q. Looking at the circus train? A. Yes, sir. Q. And driving east? A. Yes, sir. Q. I will get you to tell the jury just what you saw? A. All right, sir; I saw Mr. Weidekamp when he aimed to catch his train and stumble, and he fell head foremost between the cars, and his feet was lying south and his head was lying north. Q. What did he stumble * * * what made him stumble, if you know? A. I don't know; loose dirt there, but I don't know whether he stumbled in that, or how he got caught; he stumbled in some way. Q. Was there any loose dirt there? A. Yes, sir; loose dirt there. Q. At the place where he attempted to get on the cars? A. Yes, sir. Q. Who put that loose dirt there, if you know? A. The crew of section hands working there all morning; I guess they put it there."

And again on cross-examination:

"Q. The first time you saw him was when he grabbed at his train? A. Yes, sir. Q. Did he ever get hold of his train? A. I wasn't close enough to see whether he touched it or not; I was close enough to see him fall. Q. Can you say whether or not he got his hand on the

hand-hold? A. No, sir; I can't do that; I wasn't close enough to tell that. Q. You don't know whether he ever touched it or not? A. No, sir. Q. You say he fell? A. Yes, sir. Q. Did you see him stumble? A. I seen him when he fell, and he must have stumbled and fell. * * * The Court directs the witness not to tell what Mr. Weidekamp must have done, but to tell what he, the witness, saw. Q. Do you know whether he stumbled or not? A. I don't know whether he stumbled; I know he fell. Q. You don't know what caused him to fall? A. No, sir. Q. You simply saw him fall? A. Yes, sir; I simply saw him fall. Q. You don't know whether he caught hold of the handle or not? A. No, sir. Q. You were not watching his feet; you were just watching him as a whole? A. I just happened to see him when he fell. Q. You don't know whether his foot hit anything or not, do you? A. No, sir."

In addition to this evidence there were conflicting statements as to whether or not the ridge of dirt and cinders extended along the track at the point where Weidekamp attempted to board the moving train; but assuming that it was there, and that it was negligence for it to be here, still the remaining question is whether the evidence shows that the ridge of dirt and cinders had any connection with the accident or was the cause of it.

The evidence of Harpring sheds no light whatever upon the cause of the accident; he only saw the decedent after he was under the train and the cars were running over him, and does not claim to have seen him fall.

The effect of Kessler's statement, who was about 150 feet distant, is that, "he must have slipped or missed the foot-step," and further expressly states that he does not know which it was. There is nothing in his testimony which directly or by any fair inference may be said to show that the ridge of dirt and cinders had any connection whatever with the accident.

It is true the negro Birg, who was 60 or 75 feet distant at the time, says that Weidekamp stumbled in some way, but he does not know whether he stumbled on the ridge of dirt; but upon cross-examination he admitted that he did not know whether he had stumbled or not, and did not know what caused him to fall, and did not know whether his feet had hit anything or not.

Giving to this evidence its fullest effect, and taking every fair inference that may be deduced from it, it can-

not be said to show either that the ridge of dirt was the proximate cause of Weidekamp's death, or that it shows with any degree of certainty what was the cause of his death.

The accident happened at about one o'clock in the day, and the evidence is that it was then raining, and it is just as fair to say that he slipped because of the slippery conditions brought about by the rain as that he stumbled over the ridge of loose dirt. From this evidence it is necessarily speculative as to whether the ridge of dirt was the cause of the accident, or whether the slippery condition of the ground was the cause of it.

Neither courts nor juries are authorized to indulge in speculation or guess work as to the cause of accidents; there must be some tangible evidence from which it may be fairly said what brought about the accident. It has long been the rule in this State that no recovery can be had in such cases where the evidence is so unsatisfactory as to require surmise or speculation as to how the injury occurred, and that there will be no presumption of negligence. Hughes v. Cincinnati Ry. Co., 91 Ky., 526; Stewart v. N. C. & St. L. R. Co., 146 Ky., 127; Osborne's Admr. v. C. N. O. & T. P. Ry. Co., 158 Ky., 176, and many other cases.

We are of opinion that the court properly granted the new trial, and properly gave the peremptory instruction upon the second trial, and the judgment is, therefore, affirmed.