## Hommes' Adm'r v. C. & O. Ry. Co. et al.

(Decided Feb. 26, 1937.)

MAURICE L. GALVIN, FRANK M. TRACY and ODIS W. BER-
TELSMAN for appellee C. & O. Ry. Co.

LOUIS REUSCHER for appellee City of Newport.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

About 6 a. m., Saturday, October 13, 1934, the life-
less body of Mrs. Loretta Hommes was found between
the east and westbound tracks of the C. & O. Railway
Company, and just at the north or northeastern en-
trance to an underpass which carried those tracks be-
neath Tenth Street of Newport, Ky. Mrs. Hommes
had died intestate and on April 5, 1935, Mathew L.
Hommes became and now is her administrator. On
April 10, 1935, he began this action against the C. & O.
Railway Company, in which he sought to recover $30,-
000 for the alleged negligent killing of his intestate.
On the 13th of April, 1935, the petition was amended,
the city of Newport was made a party defendant, and
a like recovery sought of it as a joint tortfeasor. The

cause came on for trial on December 3, 1935, and on the following day at the conclusion of the plaintiff's evidence and under the direction of the court the jury returned a verdict for the defendants. Original and amended grounds for new trial were overruled on January 6, 1936, and this appeal followed.

### Maps and Photographs.

We have been as much confused as assisted by the maps and photographs in this record. May we suggest that when any one is employed to make a map for use on the trial of a case that he should remember that the jurors and judges, for whose enlightenment the map is prepared, are not trained engineers and usually their knowledge of maps consists of what they had when they finished the eighth grade. A draftsman, who, by a map, attempts to depict a situation, should avoid getting beyond the knowledge and experience of those for whom the map is being prepared. The draftsman should select the side of the drawing board at which he expects to stand in making his drawing, should call that south, and should lay off his map accordingly, then the opposite side will be north, the side to his right the east, and the side to his left the west. The drawing paper should be placed flush with the south side of the drawing board and such lettering as must be put on the map should, if possible, extend from west to east, and be on a line parallel with the southern edge of the drawing board. At some place on the drawing there should be a short arrow to indicate the north and south line. The drawing paper should never be placed askew upon the board.

There are twelve photographs in this record and their usefulness would have been very much increased if an engineer had gone along with the photographer and had laid north and south upon the ground an arrow made of lineoleum or some other material that would show in the photograph, so that the first glance at the picture would enable any one to determine directions. Also, it would be so easy for the photographer taking the picture to note upon the negative the date it was taken.

### The Bridge Viaduct or Overpass.

This whole case revolves around a bridge viaduct or overpass by which Tenth street traffic is carried

over the two tracks of the C. & O. Railway Company, and the C. & O. Railway Company's two tracks are carried under Tenth street. From the evidence, it appears these two C. & O. tracks were constructed before Tenth street was constructed, but whether or not that is true is a matter of no importance because there came a time, either right then or not long thereafter, when it was necessary that a way be found to enable traffic to be carried across these two railway tracks, and since the railway tracks were constructed in a cut about 25 feet in depth, the logical solution was to construct an overpass to carry the traffic of Tenth street from one side of these railway tracks over them to the other. At this point the railway tracks, as they go north, gradually curve to the right, so that it is difficult to describe the crossing of this street and these railways further than to say that the general line of the railways is about N. 5 E. and the general line of Tenth street is about S. 40 W., thus the figure to be closed by the making of this overpass will have two practically parallel sides running about N. 5 E., and two practically parallel sides running about S. 40 W. It will contain two acute angles, about 35 degrees each, and two obtuse angles about 145 degrees each. To make this overpass, a skew bridge was constructed. In order that no one may misunderstand our description, we will say this: If some one dug a ditch diagonally across a road so it opened a gash in the roadway 90 feet one way and 3 feet the other, we would say that to bridge that opening would require a bridge 90 feet wide and 3 feet long. Just so in this case to make this viaduct or overpass required a bridge 115 feet wide and 62 1-2 feet long.

Because the engineer who drew the map used in this case, drew it askew upon his drawing board, great difficulty has been presented, but the attorneys finally agreed to turn the whole face of the earth rather than to attempt to turn their map and accordingly they speak of Park avenue, Vine street, and the C. & O. railway tracks as all being parallel and running north and south. Tenth Street and Center Street are treated as parallel and running east and west.

The Place and Alleged Cause of the Accident.

In the course of time, the wooden flooring of which this bridge viaduct or overpass was made be-

came worn, and it was necessary to refloor it, and in doing that the following strips of flooring had to be renewed: On the south side of this bridge a wooden walkway, 9 feet, 9 inches wide, had to be refloored, then north of that a driveway, 45 feet, 8 inches wide, had to be refloored, two wheel guards, one on either side of this driveway and each 8 inches square, had to be replaced to prevent vehicles from driving off this driveway onto the adjoining footways. The footway on the north side of this overpass was formerly 10 feet, 3 inches wide, but a 20-inch watermain of the city of Newport was installed on that side of the bridge and this watermain, with the space needed to enable workmen to get around and about it, occupied so much of this 10 feet, 3 inches, that there was left for footway only 6 feet and a fraction on that side. Three feet, 4 inches, south from this footway, or from the northern wheelguard, we find the north rail of the C. N. & Co. Street Railway track. The gauge of this street railway is 5 feet, 2 inches, so that the south rail of the street railway will be found 8 feet, 6 inches, from the northern wheelguard, the northern boundary of the driveway proper. We cannot from this record say whether the work of reflooring this bridge was begun on the southern side of it, as the coroner testifies, or the northern side of it, as testified by others, and it makes no great difference which, for on October 12, 1934, the defendants had removed the flooring from the strip of footway 6 feet and a fraction in width between the northern side of the driveway and the watermain.

### More About the Bridge.

When this bridge viaduct or overpass was constructed over the cut in which the C. & O. Railway tracks were constructed, sidewalls of stone masonry were laid and steel framework built therein and steel "I" beams were put across these walls and so rested upon them and the steel framework as to carry the weight of the bridge or overpass and on or about the 10th or 11th of October the woodwork on this footway between the northern wheelguard and the watermain was taken up and the "I" beams thus exposed were cleaned and painted, thus leaving some spaces between the "I" beams and other framework through which things might fall to the railway tracks below and the claim of Mrs. Hommes' administrator is that she fell through such an opening and was killed thereby. The

plaintiff did not think it of enough importance to go under this overpass and measure and make a diagram showing these "I" beams, their number, location, and size of the openings between them. There is no evidence from which the size, number, shape, or location of these openings can be determined. From a photograph of them put in evidence, they appear to be quite near together.

To succeed, the administrator must show the defendants owed to Mrs. Hommes some duty at this point, that they neglected that duty, and that Mrs. Hommes was by the negligence of the defendants caused to fall through one of these openings and to fracture her neck and skull and to sustain such other injuries thereby that she died as a direct result thereof.

What evidence there is shows Mrs. Hommes spent the evening of October 12th, with a friend, Mrs. Rose Stevens, who lived at 1116 Vine street in Newport, where she remained until about 10:45 or 11 o'clock, when she left and according to Mrs. Stevens walked north on Vine street to Center and crossed Center and turned west, and the last Mrs. Stevens saw of her, she was walking west on Center toward Park street. Without objection, Mrs. Stevens was allowed to state that Mrs. Hommes had told her she was going to the station on 10th street (which is just 44 feet west of this 10th street overpass), that there she would get a Fort Thomas car and transfer at 3d street to a Newport and Covington car, and in Covington she would change to a Main street car which would put her within one block of her home. There is no evidence any one saw Mrs. Hommes alive after she passed out of the sight of Mrs. Stevens as she was walking west along Center street.

### The Finding of the Body.

The next morning, Saturday, October 13th, Mr. Charles Grogan had started to walk the C. & O. Railway tracks and shortly after 6 o'clock he found the dead body of Mrs. Hommes between the two C. & O. railway tracks. He notified the police and the railroad authorities and when they came he stayed with them a short time. He described the location of this body as being between the two tracks and about 6 or 7 feet east of a drain. He says there were three or four openings

in the overpass where boards had been taken up from across the girders. He described the "I" beams as girders, and when asked whether or not those girders were immediately over the body, he answered:

"Yes—no—yes, they were over where the body laid because we were standing under them girders and drips of frost or rain would drip down like rain."

We will say more of this later. He did not go up on the overpass, and when asked to describe the condition of the body, said:

"Why, the body just laid there clothed and nothing was disturbed, they were all in place like the body was laying. The body was laying face down to the ground, cinders and little stones were all pressed in her flesh here."

It is the claim of her administrator that Mrs. Hommes, in order to reach the station or waiting room west of the overpass, had crossed Tenth street at the foot of Park avenue, had then entered the portion of the barricade left open for the passage of the street car, and that from there she had wandered onto and fallen through some portion of the footway north of the bridge that had been stripped of flooring, painted, and left open. If the administrator were able to prove all that, he would be in a very strong position, but about all the proof he has is that this woman was alive and well about 11 o'clock the night before and was dead near the end of this underpass about 6 o'clock the next morning.

There is considerable dispute in the briefs about the sufficiency of these barricades. The administrator stoutly relying upon the case of De Garmo v. Vogt et al., 151 Ky. 847, 152 S. W. 969; while the defendants insist their barricades were sufficient and that the object of the barricades is notification and not fortification as we held in the recent case of Watkins' Adm'r v. City of Catlettsburg, 243 Ky. 197, 47 S. W. (2d) 1032, but without further discussion of the questions of barricades and contributory negligence, we shall pass on to what we think are more important features of this case.

### Proximate Cause of Death.

Under no circumstances can the administrator re-

cover unless he has evidence to show this woman died as a proximate result of injuries received by falling through one of the open places between some of these "I" beams.

## Wounds on the Body.

Dr. Schultz of the Speers Hospital was directed by the coroner to make an autopsy on the body of Mrs. Hommes to determine the cause of her death and he made such on the evening of October 13, 1934. He found the cause of her death to be a fractured neck with brain swelling and hemorrhage in the base of the brain. He, of course, made other findings which he treated as unimportant, among such findings was pilitis or pus in the kidney, bruises on the deltoid muscle of the right shoulder and on the left side of the scalp which were rather extensive. There were some scars on Mrs. Hommes heart indicating she had had myocarditis and had recovered. She was a woman fifty-two years of age, with "a marked amount of arteriosclerosis." Evidently this woman was a candidate for apoplexy. There had been considerable hemorrhage from the bruise on the right shoulder, and the bruise on the scalp, and within the skull at the base of her brain. Of course, all hemorrhage took place while the woman was alive and that suggests many theories. Could Mrs. Hommes have sustained a rupture of some cerebral blood vessel that caused her to bleed internally at the base of the brain and possibly caused her to fall and sustain other bruises? Could some one have struck her a blow at the base of the skull, and having produced the bleeding found within the skull, and have afterwards thrown her through an opening in this overpass, or thrown her over the wall or balustrade at the north side of the overpass? Some support for this is found in the fact that these "I" beams were freshly painted and the only mark or scar upon them was the rubber-heel mark of a man's shoe. Dr. Helmbold, the coroner, was present at this autopsy. He mentioned the injuries mentioned by Dr. Schultz and also mentions a bruise on one of Mrs. Hommes' legs, and a few bruise marks on her hands.

The bleeding within and at the base of Mrs. Hommes' skull, the bruise and bleeding on the left side of her scalp, the bruise on her leg, on her side, the bruise and tear on her right shoulder, all indicate she had

received considerable rough treatment before she died. Did she get this rough treatment before her body fell, was thrown, or placed where it was found? We think this record answers that question. Mr. Grogan, the witness who found her body, speaks of cinders and little stones being pressed into her flesh. Her body and clothing were in no disorder. If she were alive when her body fell, was thrown, or was placed where it was found, it was entirely natural that she should bleed at each place where a little stone or cinder was pressed into her flesh, yet no one makes mention any where of any bleeding from the wounds produced by these cinders, stones, and pebbles. It is no answer to say the record is silent on this subject. The plaintiff made this record. The presumption is that the action of the trial court is correct. If the plaintiff hopes for reversal, he should have in this record something to which he can point and say, "The court in giving a peremptory instruction erred here." We have not yet found such.

## Through What Hole Did She Fall?

Dr. Helmbold, the coroner, found a little lint on the edge of one of the girders and he found a little tear on the coat that had little pieces of material adhering that looked like some of the paint from the girders and he estimated this place where, as he thought, the body went through to be about 15 feet from the end of the guard rail. Now this guard rail was 62 feet long. The body was found about midway between the two tracks. The space between the two tracks makes it reasonable to suppose the hole through which the body fell was about midway between the two ends of this guard rail, that is, about 31 feet from either end of it. So this suspected place, 15 feet from one end, could hardly be the place through which the body could have fallen and landed where it was found. If the man, whose rubber heel track was found near this place, actually thrust her body through this opening, these defendants are not responsible for what he did.

What the coroner meant by the expression, "15 feet from the east end of the bridge," is not clear. Plaintiff's counsel saw that and picking up a photograph asked: "15 feet in that way?" and the coroner said, "Yes." Then followed considerable interrogation about the wheel guard.

## Position of the Body.

No one undertook by the suspension of a plummet to determine through what, if any, hole in this bridge or overpass the body of Mrs. Hommes may have fallen. Mr. Grogan testified to certain conclusions of his that certain girders were immediately over the body, because, "We were standing under those girders and drips of frost or rain would drop down like rain." The coroner testified to practically the same thing. No one who on looking up is struck in the face by a snow flake or drop of rain can say whence they came, often he cannot even give the general direction whence they came. These men merely guessed and passed their guess on to the jury for it in turn to guess again.

If the coroner was referring to a point 15 feet from the east end of the wheel guard as the location of the hole through which he thought Mrs. Hommes fell, then she would have fallen at a point 16 feet east of where her body was found. If he means 15 feet from the north side of the overpass, then he located this hole between the two rails of the street car line which no witness claims was then torn up.

If this case had been submitted to the jury, all it could have done in determining the cause of Mrs. Hommes' death would be to guess. Therefore it was not error to direct a verdict for defendants. See discussion of this question of conjecture in Kidd v. Modern Amusement Co., 252 Ky. 386, 67 S. W. (2d) 466, 467; Louisville & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257; Wintuska's Adm'r v. Louisville & N. R. Co., 20 S. W. 819, 14 Ky. Law Rep. 579; Highsplit Coal Co. v. Palmer's Adm'r, 231 Ky. 24, 20 S. W. (2d) 1020; Louisville & N. R. Co. v. Cook, 183 Ky. 773, 210 S. W. 661; Gregory's Adm'x v. Director General, 195 Ky. 289, 242 S. W. 373; Hurt v. Louisville & N. Ry. Co., 116 Ky. 545, 76 S. W. 502, 25 Ky. Law Rep. 755; Weidekamp's Adm'x v. Louisville & N. R. Co., 159 Ky. 674, 167 S. W. 882; City of Ashland v. Burley, 265 Ky. 176, 96 S. W. (2d) 581, and Stuart's Adm'r v. Nashville, C. & St. L. Ry. Co., 146 Ky. 127, 142 S. W. 232. We held a directed verdict was proper in the Wintuska Case, which is a much stronger case than this one. In Delaware & Hudson Co. v. Ketz (C. C. A.) 233 F. 31, a judgment was reversed where there was far less of the element of conjecture than here, and the same is

true of the case of Atchison, T. & S. F. Ry. Co. v. Toops, Adm'x, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896.

The administrator knew what he would have to prove, for he had alleged in this petition:

> "That on or about 10:45 P. M. of said October 12th, 1934, said decedent, May Loretta Hommes, while walking in a westerly direction over and upon said overpass, so a part of said Tenth Street, by reason of the said negligence and carelessness of said defendant company, was caused to step into and fall through said uncovered and unguarded opening or space in said sidewalk precipitating her to the said railroad tracks of defendant company, so lying about 30 feet immediately below said uncovered opening or space in said sidewalk, thereby fracturing her neck and skull and otherwise so seriously injuring her that she died therefrom."

The administrator has introduced no witness who testifies he saw anything of that kind occur, in fact, the administrator utterly failed by direct evidence to establish his case. Indeed, there is no witness who testifies he had seen the deceased on this viaduct at any time, October 12, 1934, or any other time, but the administrator has attempted to make out his case by proof of facts and circumstances from which he would have the jury infer his intestate came to her death in the manner he had alleged, but the facts he does so establish lead more logically to a conclusion the happenings on this viaduct that night were quite other than as alleged in the petition. We have neither the time or the ability to discuss circumstantial evidence extensively. We are fully aware that Paley said, "Facts cannot lie, while witnesses can and often do," but facts often deceive, and inferences drawn from them are often erroneous. We said in the Kidd Case, supra:

> "It is difficult to point out with exactness just when a case should be submitted to the jury, but Mrs. Kidd has not made out such a case when the only reasoning by which a juror could find for her is: 'The plaintiff has some evidence to show this accident could have occurred as she contends, therefore I guess it did.' Such a verdict would

be rested only on a supposition. On the other hand, she would have a case to be submitted if she had enough that a juror could say: 'The plaintiff has such evidence concerning the occurrence of this accident, that its happening cannot reasonably be accounted for otherwise than that it occurred as she contends, therefore I conclude it did happen as she contends.' Such a verdict would be rested on an inference."

Sec. 45 C. J. p. 1267, sec. 835, N. 41.

From the proof the plaintiff had, the jury might suppose Mrs. Hommes came to her death as alleged, but it could just as logically conclude she came to her death in some other manner, therefore there was not sufficient evidence to warrant the submission of the case to the jury. A litigant's rights are not to be guessed away.

Judgment affirmed.