# Jackson Purchase Rural Electric Co-Op. Corporation v. Burns.

### Nov. 26, 1940.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

This is an appeal from a judgment on a verdict awarding Leon Burns, plaintiff below, the sum of $500 for injuries sustained when he came in contact with one of the appellant's power lines. The Rural Electric Co-Operative is insisting that the judgment be reversed on the grounds that (1) it was entitled to a peremptory instruction at the close of the evidence offered by Burns; (2) the verdict is flagrantly and palpably against the evidence; and (3) the verdict can not be sustained because it was based upon testimony at variance with

well established and universally recognized physical and mechanical laws.

The Co-Operative line passes about 60 feet to the rear of the house in which the appellee was living at the time he sustained his injuries (January 19, 1939). The power line consists of three uninsulated wires, the top one being some 26 to 28 feet from the ground. The top wire is a 6,900-volt line, the second wire, some 3 feet below the top one, is a neutral one, and the third, some 18 inches below the second one, is a 110-volt line.

The charge of negligence on the part of the Co-Operative is as follows:

"That said defendant constructed said power line across the property occupied by this plaintiff, and that at said time and place this plaintiff had an aerial on said property for radio purposes and that said defendant carelessly, negligently, and recklessly strung said wires under and near said radio aerial, and that said defendant knew, or by the exercise of ordinary care could have known, and it did know that said aerial wire was so placed, and that it negligently, carelessly, and recklessly placed and strung its electric wires in close proximity and just beneath said aerial wire, and kept its wires highly charged with electricity, and that it knew, or by the exercise of ordinary care could have known that if said aerial wire should break and fall across said wires it would become highly charged with electricity, and that it would be in this plaintiff's back yard, and that said defendant was required to anticipate that said wire would break and become charged with electricity, and would be upon the ground in the back yard of this plaintiff, and that it was required to anticipate that this plaintiff would be in his back yard, and if and in the event said aerial wire come in contact with defendant's wires and upon the ground in this plaintiff's back yard, and would come in contact with said wire, and thereby be severely injured, and notwithstanding these facts, said defendant did not use that degree of care required of it by law in the construction of its wires, and by reason of its negligence, carelessness, and recklessness, as complained of herein, said plaintiff received his injuries."

As indicated from the foregoing quotation from the appellee's amended petition, it is his contention that the Co-Operative built its power line under his radio aerial which was strung between two trees. According to his testimony the aerial wire was some four or five feet above the upper wire of the power line, and the end away from the house was about three feet beyond the power line. The petition alleges facts similar to those found in the cases of Kentucky Utilities Co. v. Black's Adm'x, 244 Ky. 562, 51 S. W. (2d) 905, and Texas Power & Light Co. v. Culwell, Tex. Com. App., 34 S. W. (2d) 820

There is such sharp conflict in the testimony for the appellee and that for the appellant as to the cause of the injury that it is necessary for us to set forth briefly each version.

On direct examination Burns testified as follows:

"A. I went in the house and then went back to the coal shed to get a bucket of coal. I picked up the coal bucket and went out to get a bucket of coal. The coal pile was by the coal house; it was ten steps from my back door out to the coal pile. I hung my foot in some wire and kicked it a few times but it did not come loose, and I set the coal bucket down and reached down to pick up the wire, and when I got hold of it it picked me up and threw me out there on my back.  *  *  *"

"A. When it threw me back there I was as stiff as I could be, I felt like a man falling in a brush pile, and there was fire coming from this high power line down on me. There was a blue flame, it looked like a blaze, running down this wire eight feet from this tree, and it run down on me.

"Q. Then what happened? A. I remember the lights went out, and I don't know what happened after the lights went out."

He testified also that it was stormy and windy on January 19th. It is his theory, as we understand it, that the aerial wire had fallen down across the power line.

A witness, who worked at the same place Burns worked, said that the aerial was up before the Co-Operative built its line. Burns testified in effect that, even

though he went to the place where he worked on Friday following his injury Thursday night, he was in a dazed or semi-conscious condition and was not fully aware of what was going on until Saturday. Burns' hand was burned and he testified that his feet were blistered and that he suffered other injuries. He was treated for the injury to his hand.

Employees of the Co-Operative, who visited the scene of the accident upon complaint that the lights were out, said that they found a blown fuse, indicating that there was a short circuit somewhere. They testified that they found a wire with an old glass salt shaker attached (which had been used as an insulator on the aerial), hanging over the top wire of the power line some 12 or 15 feet from a tree; that the end of the aerial wire to which the salt shaker was attached was hanging down some 18 inches below the high voltage wire; and that the other end of the small wire was near the ground. These witnesses testified further that when an object, such as the wire in question, comes in contact with the high voltage line, the line goes out instantaneously, thereby causing the fuse to blow, and also that it would have been impossible for the aerial line to fall across the high voltage line and onto the ground without blowing the fuse.

Mrs. Byron Downs, who lived about 100 yards from the Burns home, testified:

"I did not see or hear very much. I was preparing supper and my kitchen was on the side next to the Burns and I saw a ball of fire run up like a sky rocket and then I heard somebody holler."

She testified further that the lights went out about the same time.

Four witnesses testified as to what they heard Burns say as to how he came in contact with the wire. Byron Downs testified that he heard Burns say on Sunday after the accident in the presence of Mr. Goodman that:

"He (Burns) said he started out the back way to the coal shed and there was some wire got tangled up in his feet and he slung it underhanded to get it out of the way and it went over the wire."

Bert Goodman, a neighbor of Burns, testified that, after

Burns came back from being treated the night of his injury, "He (Burns) said he got tangled up in some wire and picked it up and gave it a sling and threw it over the wire." This witness testified further that he, Mr. Burns and Mr. Downs were talking and that Burns said: "That he just got tangled up in some wire and he picked it up and gave it a sling and threw it over the wires, that is all." Mrs. Bert Goodman said that she saw Burns after he had been to see the Doctor, and in answer to the question how the accident occurred, he said: "All I can remember is he stumbled over this wire and picked it up in his hand and gave it a sling." Harold Goodman testified that he heard Burns say: "Before he left he said he got tangled up in some wire and he reached down and picked it up and gave it a sling. That is the way he explained it to me." None of these four witnesses was impeached. However, as indicated above, Burns testified that he was in a dazed and semi-conscious condition after he was shocked.

That Burns came in contact with a charged electric wire and was shocked around 6:30 p. m. on Thursday, January 19, 1939, is beyond dispute. The question is: Did his injury result through any negligence on the part of the Co-Operative? We have Burns' testimony that the power line was built under his radio aerial and the testimony of a fellow worker to the same effect. We have his testimony and that of Mrs. Goodman that the lights went out at or about the time he came in contact with the wire. There is testimony that his foot became tangled in the wire and he reached down, took hold of it to loosen it and was shocked. Against this is the unimpeached testimony of four disinterested witnesses that Burns said he caught his foot in the wire, picked it up and gave it a sling, two of the witnesses saying that he said he threw it over the power line. We have also the testimony of the employees of the Co-Operative that they found the aerial wire hanging across the power line with the end to which the salt shaker was attached hanging down some 18 inches from the top wire with the other end near the ground. Then there is the testimony of witnesses for the Co-Operative that it would have been impossible for the aerial wire to have fallen across the power line and onto the ground without blowing a fuse and thereby causing the line to go out. It is beyond doubt that the line went out at or about the

time Burns was shocked. Is such evidence, with all the inferences that the jury could justifiably draw from it, sufficient to support the verdict for Burns? If it is not, the trial court was not bound to submit the case to the jury, but should have directed a verdict for the Co-Operative. Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877. It is our conclusion, after viewing the evidence as a whole, with all the inferences which the jury might have justifiably drawn from it, that it is not sufficient to support the verdict.

The acceptance of Burns' version of the happening takes us into the realm of speculation and guesswork as to how the aerial wire came in contact with the power line. This we are not authorized to do. Weidekamp's Adm'x v. Louisville & N. R. Co., 159 Ky. 674, 167 S. W. 882; Magness' Adm'x v. Hutchinson, 274 Ky. 226, 117 S. W. (2d) 1041.

There is merit also to the contention that the verdict is at variance with recognized and established physical and mechanical laws. The testimony of the Co-Operative's witnesses as to what would cause the power line to go out is unimpeached, and Burns offered no testimony in conflict with that of the Co-Operative on this question. Louisville & N. R. Co. v. Chambers, 165 Ky. 703, 178 S. W. 1041, Ann. Cas. 1917B, 471; Louisville Water Company v. Lally, 168 Ky. 348, 182 S. W. 186, L. R. A. 1916D, 300; Pioneer Coal Company v. Lisenbee, 276 Ky. 308, 124 S. W. (2d) 94.

It follows, therefore, that it is our conclusion that the judgment should be and it is reversed, with directions to set it aside and for proceedings consistent with this opinion.